IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ORION REFINING CORPORATION, | ) Case No. 03-11483 (MFW) |
| | ) |
| Debtor. | ) |
| | ) |
| FLUOR ENTERPRISES, INC., | ) |
| | ) Adv. Proc. No. 04-52447 (MFW) |
| Plaintiff, | ) |
| v. | ) |
| | ) [Parallel Contested Matter under Fed. R. |
| ORION REFINING CORPORATION, | ) Bankr. P. 9024 and Fed R. Bankr. P. 60(b)] |
| CYPRESS ASSOCIATES, LLC as ORC | ) |
| DISTRIBUTION TRUST REPRESENTATIVE, | ) |
| | ) |
| Defendant. | ) |
| ORION REFINING CORPORATION, | ) |
| | ) |
| Counter-Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
| Counter-Defendant. | ) |
| | ) |

## NOTICE OF APPEAL

Defendant, Cypress Associates, LLC as ORC Distribution Trust Representative, successor-in-interest to Orion Refining Corporation ("Defendant"), appeals under 28 U.S.C. § 158(a) from the:

(i)    Order Relating to Fluor Enterprises, Inc.'s Motion for Relief From Previously Entered Critical Fire and Trade Vendor Orders (Bankr. D.I. 1811) (Exhibit A hereto), entered in the main case on July 27, 2006;

(ii)    Findings of Fact (Bankr. D.I. 1910; A.D.I. 135) (Exhibit B hereto);

(iii)   Opinion Granting Fluor Enterprises, Inc.'s Motion for Relief From Previously Entered Critical Fire and Trade Vendor Orders (Bankr. D.I. 1911; A.D.I. 136) (Exhibit C hereto); and

(iv)    Order Granting Fluor Enterprises, Inc.'s Motion for Relief From Previously Entered Critical Fire and Trade Vendor Orders (Bankr. D.I. 1912; A.D.I. 137) (Exhibit D hereto) (collectively, the "Opinion and Orders"), entered in the above-captioned proceedings on July 20, 2007.

The names of the parties to the Opinion and Orders appealed from, and the names, addresses and telephone numbers of their respective attorneys are as follows:

| PARTY | ATTORNEYS |
|---|---|
| Appellant, Cypress Associates, LLC as ORC Distribution Trust Representative, as successor-in-interest to Orion Refining Corporation | William H. Sudell, Jr., Esquire Donna L. Culver, Esquire Thomas W. Briggs, Jr., Esquire Morris, Nichols, Arsht & Tunnell LLP 1201 N. Market Street, 18th Floor P.O. Box 1347 Wilmington, DE 19899-1347 Telephone: (302) 658-9200 Facsimile: (302) 658-3989 |
| Appellee, Fluor Enterprises, Inc. | Francis A. Monaco, Jr., Esquire Womble Carlyle Sandridge & Rice 222 Delaware Avenue, Suite 1500 Wilmington, DE 19801 Telephone: (302) 252-4320 Facsimile: (302)-252-4330 |
| | Charles R. Penot, Jr. Middleberg Riddle & Gianna 717 North Harwood Street, Suite 2400 Dallas, Texas 75201 Telephone: (214) 220-6300 |

Joseph B. C. Kluttz
Kennedy Covington
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina  28202
Telephone:  (704) 331-7485

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

William H. Sudell, Jr. (#463)
Donna L. Culver (#2983)
Thomas W. Briggs, Jr. (#4076)
1201 North Market Street
Wilmington, Delaware  19801
(302) 658-9200
    Attorneys for Appellant/Defendant
    Cypress Associates, LLC

Dated:  July 30, 2007

993100

**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| ORION REFINING CORPORATION, | ) | Case No. 03-11483 (MFW) |
| | ) | |
| Debtor. | ) | **RE: D.I. No. 38, 205 and 1283** |
| | ) | |

## ORDER RELATING TO FLUOR ENTERPRISES, INC.'S MOTION FOR RELIEF FROM PREVIOUSLY-ENTERED CRITICAL FIRE AND TRADE VENDOR ORDERS

This matter was before the Court on July 7, 2006 on the Motion for Relief from Previously Entered Critical Fire and Trade Vendor Orders (the "Motion for Relief") filed by Fluor Enterprises, Inc. ("Fluor"), and on the Opposition (the "Opposition") to the Motion for Relief filed by the ORC Distribution Trust, as successor to the Debtor with respect to matters raised by the Motion for Relief (the "Debtor").

From a consideration of arguments of the parties and the pleadings filed by the parties in connection with this matter; the reasons set forth on the record at the hearing; and based on the Court's familiarity with the record of this matter and the underlying Chapter 11 case, it is hereby

ORDERED:

1. The Opposition is OVERRULED and the Motion for Relief is GRANTED to the extent of interim relief as provided in this Order;

2. Pursuant to Fed. R. Bankr. P. 9024 (Fed. R. Civ. P 60(b)(6)), this Court's Order Authorizing the Debtor to Pay Certain Fixed, Liquidated and Undisputed Prepetition Claims of Fire Vendors and Mechanics and Materialmen Pursuant To 11 U.S.C. Section

105(a) and 363(b) entered on an emergency basis on May 15, 2003[ D.I. No. 38], and in identical form as a final order on June 5, 2003 [D.I. No. 205] (together, the "Critical Fire Vendor Order") is hereby modified to clarify the intent of the Critical Fire Vendor Order to provide in Fluor's case that Fluor is entitled, pursuant to its Motion for Relief, to obtain an Order from this Court requiring the Debtor to pay Fluor in two instances: (i) if there were an agreement between the parties that Fluor was a Critical Fire Vendor and that its prepetition amounts earned would be paid if Fluor finished its work, or (ii) if the Debtor made misrepresentations that Fluor's prepetition amounts earned would be paid if Fluor finished its work and Fluor reasonably relied on those misrepresentations and acted to its detriment by completing its work.  Except as to Fluor's right to proceed pursuant to this Order to pursue payment under the theories identified in (i) and (ii) above, all defenses the ORC Representative or the Debtor may have to Fluor's claims under (i) and (ii) of this paragraph, including the proper measure of any damages, are preserved~~,~~ and

~~Without limiting the foregoing, with respect to (ii) above~~ no determination is made by this Order as to ~~(a) whether Fluor is entitled to relief for any misrepresentation that was~~ any facts relevant to Fluor's claim or defenses to that claim under (i) or (ii) above. ~~not an intentional misrepresentation or (b) what Fluor must prove to establish that Fluor~~ ~~acted to its detriment by completing its work.~~

3.    This Court retains jurisdiction of Fluor's Motion For Relief to enter such further orders or afford such further relief as may be appropriate under the circumstances.

4. The parties are directed to propose a joint schedule to the Court for completion of discovery, which will be incorporated into a separate scheduling order for final determination of the matter on the merits.

Dated: July 2006

Mary F. Walrath
Chief United States Bankruptcy Judge

**EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ORION REFINING CORPORATION, | ) Case No. 03-11483(MFW) |
| | ) |
| Debtor. | ) Related Documents: 1283 and |
| | )                          1788 |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary No. 04-52447(MFW) |
| | ) |
| ORION REFINING CORPORATION, | ) |
| CYPRESS ASSOCIATES, LLC as | ) |
| ORC DISTRIBUTION TRUST | ) |
| REPRESENTATIVE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| ORION REFINING CORPORATION, | ) |
| | ) |
| Counter-Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
| Counter-Defendant. | ) |

## FINDINGS OF FACT[1]

A.    Procedural Background

1.    This is a parallel contested matter and adversary proceeding commenced by Fluor Enterprises, Inc. ("Fluor") filed in the chapter 11 bankruptcy case of Orion Refining Corporation ("Orion").

2.    Fluor is a California corporation having its

---

[1]    These Findings of Fact, together with the accompanying Opinion, constitute the findings of fact and conclusions of law of the Court pursuant to Rules 7052 and 9014 Federal Rules of Bankruptcy Procedure.

principal place of business in California.  (A.D.I. 1 at ¶ 5)[2]

3.   The ORC Distribution Trust (the "Trust") is a trust established pursuant to the Amended Plan Of Liquidation of Orion Refining Corporation for the purpose of liquidating Orion's assets.  (M.D.I. 1242 at ¶ 5.1.2)

4.   In its adversary complaint filed February 4, 2004, Fluor originally sought in excess of $26 million for pre-petition work performed by Fluor for Orion, alleging certain liens, fraud and misrepresentation, promissory estoppel and constructive trust.  (A.D.I. 1)

5.   On March 5, 2004, Orion filed its answer to the complaint and a counterclaim for avoidance of alleged preferential transfers totaling $1,951,888.47 made to Fluor. (A.D.I. 4)

6.   On April 13 and May 14, 2004, the Debtor and Fluor, respectively, filed cross-motions for summary judgment on Fluor's lien and constructive trust claims. (A.D.I. 9, 18)

7.   On June 3, 2004, Fluor separately commenced a contested matter in the bankruptcy case by filing a Motion

---

[2]  Citations to "A.D.I. __" are to the adversary case docket index and citations to "M.D.I. ___" are to the main case docket index.  Exhibits admitted into evidence at trial are cited herein as "JTX ___," and references to the trial transcript are cited as "[Trial Date] Tr. [Witness' Last Name] at [page:line]." Citations to "Admitted Fact" are to the Statement of Admitted Facts contained in the Amended Joint Pretrial Order.

for Relief from Previously Entered Critical Fire and Trade
Vendor Orders, seeking relief pursuant to Rule 60(b) of the
Federal Rules of Civil Procedure and section 105(a) of the
Bankruptcy Code from the June 5, 2003, orders which granted
Orion authority to pay pre-petition amounts owed to Critical
Vendors.  (M.D.I. 204, 205, 1283)

    8.   Orion filed its response to Fluor's motion on June
16, 2006. (M.D.I. 1788)

    9.   Further proceedings in the contested matter were
deferred until the Court's ruling on the cross-motions for
summary judgment in the adversary proceeding.

    10.  By order dated May 9, 2006, the Court entered
partial summary judgment in Orion's favor and against Fluor,
finding that Fluor had contractually waived its lien rights
and that there was no basis for the imposition of a
constructive trust.  (A.D.I. 68, 69)

    11.  On October 23, 2006, Fluor filed a motion for
summary judgment in the contested matter, which was denied
on December 21, 2006.  (M.D.I. 1833, 1854)

    12.  Thereafter, the parties engaged in discovery on
the issues raised in the contested matter and those
remaining in the adversary proceeding.

    13.  As the result of that discovery, as of the
commencement of the trial of these matters, Fluor had
reduced its claim to $20,657,860.58 and Orion had reduced

3

its preference counterclaim to $943,559.56.

14. The trial on the adversary and the contested matter was held on May 7, 8, and 9, 2007.

15. Based on the testimony presented at the trial, the Trust has withdrawn its preference counterclaim.

16. Post-trial submissions were filed on June 20 and July 5, 2007.

B. Master Services Agreement

17. Prior to the commencement of its bankruptcy case, Orion owned and operated a refinery engaged in the processing of crude oil located in Norco, Louisiana (the "Refinery"). (5/8/07 Tr. [Rayzor] at 150:7-150:15)

18. The Refinery had a coker unit, which enabled Orion to create a salable byproduct from the residue left from processing heavy sour crude oil. The coker was important to Orion's operations, because it enabled the Refinery to process a cheaper crude. (5/8/07 Tr. [Rayzor] at 153:2-153:18; 5/9/07 Tr. [Bluth] at 7:1-7:5)

19. Orion was a party to a Master Service Agreement (the "MSA") dated May 20, 2002, with PSC Industrial Outsourcing, Inc., then an affiliate of Philip Services Corporation (collectively "PSC"). (JTX 83 at ¶ 2.1; M.D.I. 1883 at ¶ A; A.D.I. 119 at ¶ A)

20. Pursuant to the terms of the MSA, which was to extend through May 31, 2004, PSC performed maintenance and

4

turnaround[3] services, upon the acceptance of a work assignment issued by Orion.  (<u>Id.</u>)

21.  The MSA specified all the material terms and rates for projects undertaken by PSC.  The parties entered into the MSA because it would be difficult to negotiate a contract and have it signed within the time span normally needed for individual projects, particularly in the case of emergency services.  (JTX 83; 5/7/07 Tr. [Stinger] at 21:1-22:18, 23:16-24:3)

22.  The MSA provided that Orion may request that PSC perform specified services by issuing a work assignment in a form specified in the MSA but provided that "[t]his Agreement does not obligate [Orion] to request services from [PSC], nor does it obligate [PSC] to accept any work requests for Services from [Orion] . . . ." (JTX 83 at ¶ 2.1)

23.  The term "Work Assignment" is defined in the MSA as "a written authorization executed and issued by the Purchasing Department of [Orion] to [PSC] for the performance of Services . . . ."  (JTX 83 at ¶ 1.17)

24.  The term "Services" is defined in the MSA as "any and all services of the type described in <u>Schedule A</u> which may be requested by [Orion] by way of issuance to [PSC] of a

---

[3]  A "turnaround" is a planned outage or shutdown of a refinery for the purpose of performing repairs, improvements and other work items that can only be completed while the units are not operating.  (5/9/07 Tr. [Coffee] at 53:14-53:17)

Work Assignment from time to time . . . ."  (<u>Id.</u> at ¶ 1.15)

    C.  <u>Refinery Fire</u>

    25.  On January 29, 2003, an explosion and fire occurred in the west end of the Refinery, causing extensive damage to the coker unit.  (Admitted Facts at ¶ B; 5/8/07 Tr. [Rayzor] at 152:17-152:24)

    26.  After briefly considering other contractors for the coker rebuild, Orion determined to retain PSC because it was already doing maintenance work at the Refinery and Orion felt comfortable that it could do the job.  (5/9/07 Tr. [Bluth] at 9:7-9:14)

    27.  Thereafter, on February 4, 2003, Orion and PSC executed a Work Assignment authorizing PSC "to act as the general contractor for the Crude/Vacuum/Coker unit restoration and WestPlantTurnaround" as directed by Orion's job site representative Steve Coffee, in accordance with the pricing and terms of the MSA and the additional pricing terms contained within the February 4 Work Assignment.  (JTX 85; 5/7/07 Tr. [Rusich] at 167:20-167:23, 184:5-184:14, 184:21-184:25; 5/7/07 Tr. [Stinger] at 64:1-64:7)

    28.  The parties contemplated that there would be hundreds of further Work Assignments issued in accordance with the procedures under the MSA, defining the exact scope of the individual tasks to be performed in connection with rebuilding the coker unit.  (5/7/07 Tr. [Rusich] at 167:14-167:23)  In fact, following execution of the February 4 Work

Assignment, Orion issued approximately 600 Work Assignments to PSC and others covering specific projects which extended through the completion date of the coker rebuild.  (5/9/07 Tr. [Coffee] at 59:16-60:12, 60:22-61:15; 5/7/01 Tr. [Stover] at 85:17-85:22)

29.  Fluor had the right to refuse to accept any Work Assignment which was issued by Orion under the MSA.  (JTX 83 at ¶ 2.1)

D.  <u>Assignment of MSA</u>

30.  On March 3, 2003, Fluor, through a newly-formed acquisition vehicle, P2S,[4] purchased certain assets of PSC, including the MSA which was assigned to Fluor with Orion's consent.  (Admitted Facts at ¶ C; 5/8/07 Tr. [Pozzo] at 7:10-7:23)

31.  After the date on which the MSA was assigned, Fluor performed substantial services for Orion on the coker rebuild.  (Admitted Facts at ¶ E)

32.  Fluor also performed services for Orion with respect to general maintenance and a turnaround at the Refinery which was accelerated to take place while the fire repairs were underway.  (<u>Id.</u>; 5/9/07 Tr. [Coffee] at 56:9-56:22)

E.  <u>Coker Rebuild</u>

33.  The coker rebuild was performed on an emergency

---

[4]  Fluor and P2S are referred to herein as "Fluor."

7

basis on an accelerated schedule.  Work was done seven days
a week, twenty-four hours a day, and was limited only by the
number of people that could work in the restricted area.
The job was done as quickly as possible.  (5/7/07 Tr.
[Stover] at 80:19-81:1)

34.  At any given time, as many as 550 to 600 people
were working on the coker rebuild.  (5/7/07 Tr. [Constable]
at 150:4; 5/8/07 Tr. [Pozzo] at 18:10-18:12; 5/9/07 Tr.
[Coffee] at 64:13)

F.    Accounting on the Coker Rebuild

35.  In the construction industry, it is typical to
have separate systems for accounting and invoicing on the
one hand and project controls for the tracking of incurred
costs on the other.  (5/8/07 Tr. [Pozzo] at 12:12-12:19)

36.  For the coker rebuild project, a "Fast Track"
system for project controls was used which allowed Fluor to
check progress on a daily basis (including labor, materials
received and sub-contractor work performed) and to provide
Orion with progress reports on a weekly basis.  (5/8/07 Tr.
[Pozzo] at 8:19-9:7, 10:23-11:1; 5/9/07 Tr. [Coffee] at
67:17-67:20)

37.  When it got the weekly reports, Orion reviewed
them in detail to ensure accuracy and then used them to
provide its management with real-time figures on actual
costs incurred to date in connection with the coker rebuild
project.  (5/9/07 Tr. [Coffee] at 67:17-68:10)

38.   Because of the speed of the work being done, the
large number of on-site personnel, subcontractors and
vendors involved in the project, and the need to reconcile
cost data on an on-going basis, it was not unusual in this
type of project for invoicing to lag performance by two to
three months, and for invoicing to be as much as $20 million
in arrears.  (5/7/07 Tr. [Stinger] at 45:14-46:22)

39.   For a variety of reasons, including difficulties
integrating PSC, Fluor was delinquent in billing Orion for
its work at the Refinery. (5/8/07 Tr. [Penn] at 99:17-99:25;
5/8/07 Tr. [Pozzo] at 14:4-14:7; 5/7/07 Tr. [Stover] at
76:2-76:4)

40.   In fact, Fluor first invoiced Orion for the coker
rebuild during the first week of May 2003. (JTX 88 at p. 10;
5/8/07 Tr. [Pozzo] at 45:19-46:5, 46:18-46:20)

41.   As of May 3, 2003, Fluor had billed Orion only
approximately $570,000 and PSC had billed Orion only $3.1
million.  (JTX 52 at Ex. A; 5/8/07 Tr. [Rayzor] at 168:15-
168:20)

G.   Bankruptcy Planning

42.   Previously, beginning in late 2002, Orion had been
considering a bankruptcy filing as the vehicle for
consummating a sale of the Refinery.  (5/8/07 Tr. [Rayzor]
at 156:14-156:18, 157:9-157:13)

43.   As a result of the fire and its negative impact on
Orion's already deteriorating financial condition, Orion

retained Steven L. Victor, a principal with the firm of
Development Specialists, Inc., as Chief Restructuring
Officer of Orion on or about April 16, 2003.  (5/8/07 Tr.
[Rayzor] at 154:5-154:9, 157:7-157:13; 5/9/07 Tr. [Bluth] at
10:7-10:14; Admitted Facts at ¶ F; 5/9/07 Tr. [Victor] at
79:3-79:5)

    44.  Upon his arrival, Victor's responsibilities
included leading the bankruptcy effort and educating and
assisting Orion's officers (none of whom had previously been
through a bankruptcy) in managing their way through the
bankruptcy process.  (5/8/07 Tr. [Rayzor] at 158:18-158:19,
160:6-160:14; 5/9/07 Tr. [Bluth] at 10:20-10:23)

    45.  Orion's Board of Directors passed resolutions
making Victor an officer of Orion and giving him the
authority to speak on behalf of Orion.  (5/8/07 Tr. [Rayzor]
at 160:15-160:19)

    46.  The Board did not, however, restrict the other
officers' duties, responsibilities, or authority.  (5/8/07
Tr. [Rayzor] at 185:7-185:17)

    47.  In preparation for the bankruptcy filing, Victor
explained to Orion's management that it could seek entry of
a Critical  Vendor Order authorizing payment of pre-petition
claims, as a means of inducing continued performance by
contractors and service providers that were critical to
operation of the Refinery.  (5/8/07 Tr. [Rayzor] at 161:24-

162:12)

H.    Rumors of Bankruptcy

48.    In early May, 2003, Fluor began hearing rumors of an impending bankruptcy filing by Orion.  (Admitted Facts at ¶ G; 5/8/07 Tr. [Pozzo] at 13:13-13:20; 5/8/07 Tr. [Penn] at 65:4-65:14)

49.    As a result of the bankruptcy rumors, Fluor's management sought to determine the amount of its potential exposure and learned for the first time of the substantial lag in its billings to Orion.  (5/8/07 Tr. [Pozzo] at 13:21-14:7; 5/8/07 Tr. [Penn] at 66:3-66:10; 5/7/07 Tr. [Stover] at 75:23-76:4)

50.    It took Fluor several days, working over a weekend, to determine how much it was owed by Orion. (5/8/07 Tr. [Penn] at 100:10-100:13)

51.    On Saturday, May 10, 2003, Orion's Chief Operating Officer, Eric Bluth, met with several representatives of Fluor: Frank Rusich, the Vice President in charge of the coker rebuild; Phil Stover, Vice President for Maintenance of Fluor; and Dan Stinger, President and CEO of P2S. (5/9/07 Tr. [Bluth] at 15:10-15:19; 5/7/07 Tr. [Stover] at 78:2-78:21; 5/7/07 Tr. [Stinger] at 35:12-35:23)

52.    At that meeting, Bluth confirmed that a bankruptcy filing was imminent and that the Refinery would be sold through the bankruptcy process.  (Admitted Facts at ¶ G;

11

5/9/07 Tr. [Bluth] at 15:10-16:1)

53.  Bluth emphasized that Fluor was critical to the completion of the coker rebuild and that the Refinery could not be sold without that work being completed.  (5/9/07 Tr. [Bluth] at 34:19-35:9)

54.  In response to questions by the Fluor representatives concerning payment of the $21 million Fluor said it was owed, Bluth explained that a Critical Fire Vendor list had been prepared, Fluor was on it, and Orion would ask for authority from the Court to pay all pre-petition claims of the Critical Fire Vendors.  (5/9/07 Tr. [Bluth] at 15:20-16:1; 5/7/07 Tr. [Stinger] at 39:7-39:12; 5/7/07 Tr. [Stover] at 79:6-79:20)

55.  At the meeting on May 10, Bluth agreed with the Fluor representatives that the amount accrued was approximately $21 million and, at that point, believed that $21 million had been set aside for Fluor in connection with the Critical Fire Vendor Motion.  (5/9/07 Tr. [Bluth] at 17:5-17:9, 18:2-18:7)

56.  Upon learning of Bluth's May 10 meeting with Fluor, Orion's Chief Executive Officer, Clark Johnson, sent an e-mail to Orion's investors, counsel and the senior members of Orion's management team advising them of the

12

meeting and that Fluor asserted they were "into Orion for about $21,000,000 including all subcontractors and non-invoiced work."  (JTX 18)

57.  Because Fluor was the general contractor for the coker rebuild and, according to its own estimate, was performing approximately 90% of that work either directly or through subcontractors, Fluor's claim of approximately $21 million seemed to match Orion's estimate of amounts due to Critical Fire Vendors.  (JTX 87 at 2; M.D.I. 156 at ¶ 5; M.D.I. 267 at ¶ 6; M.D.I. 300 at 39:14-39:18; 5/8/07 Tr. [Rayzor] at 197:18-197:24, 200:17-200:23)

58.  Johnson reported that while Fluor felt "okay" about the situation in light of Bluth's commitments to make it whole, Fluor wanted to discuss the matter with counsel to determine whether it needed to file a lien.  (JTX 18)

59.  Johnson concluded his e-mail by stating that "I don't know if a lien would have any extra significance on us, since we do intend to keep them whole anyway, but I wanted to pass it by everyone for their thoughts."  (JTX 18; Admitted Facts at ¶ H)

I.    Filing of Lien

60.  On May 12, 2003, Fluor filed a Statement of Claim and Privilege, asserting it was owed $21,399,196.96 for all

13

pre-petition billed and unbilled work performed under the MSA for fire restoration, turnaround and maintenance work. (JTX 3)

61.    This amount included work performed not only by Fluor in its own right, but by PSC and all of Fluor's subcontractors.    (Admitted Facts at ¶ J)

62.    Subsequently, on June 18, 2003, Fluor filed a Supplemental Statement of Claim and Privilege (the "Supplemental Lien"), asserting it was owed an additional $5.2 million or $26,594,595.45.    (JTX 4; JTX 76; 5/8/07 Tr. [Pozzo] at 49:3-49:21; 5/8/07 Tr. [Penn at 112:20-113:2)

J.    <u>May 13 Representations</u>

63.    At Fluor's request, on May 13, 2003, Bluth participated in a call with Fluor's President of Operations and Maintenance, David Constable, in which Bluth reiterated what he had told the Fluor representatives at the May 10 meeting: that Orion considered Fluor to be a Critical Fire Vendor, that it was critical that the coker rebuild be completed as soon as possible in order for the sale of the Refinery to proceed, that Orion would ask for authority to pay Critical Fire Vendors their pre-petition claims in full, and that Orion intended to make Fluor whole.    (JTX 1 at 3; JTX 21; Admitted Facts at ¶ K; 5/9/07 Tr. [Bluth] at 16:22-17:3; 5/7/07 Tr. [Constable] at 123:25-125:4; 5/7/07 Tr.

14

[Stinger] at 43:19-44:11)

64.   The parties discussed the fact that Fluor's invoicing for the job was not up to date, but Bluth confirmed that Orion had accrued approximately $21 million to pay Fluor.  He further stated that there was money available for payment of Critical Fire Vendors from insurance proceeds and financing and that Fluor could expect payment within a couple weeks.  (JTX 1 at 3; JTX 21; Admitted Facts at ¶ K; 5/7/07 Tr. [Constable] at 123:25-125:4; 5/7/07 Tr. [Stinger] at 43:19-44:11)

65.   In response to further concerns raised by Orion's bondholders as to whether the amount of Fluor's lien was included in Orion's DIP budget, Johnson gathered data and prepared an e-mail dated May 13 to Orion's bondholders and others reporting that the amount reserved for fire work (invoiced and non-invoiced), turnaround work, and general maintenance, totaled $20.6 million, which "ties closely with the nominal $21 million [Fluor] had mentioned."  (JTX 23)

66.   Johnson further stated that "[a]ll of the three elements of cost above are consistent with the numbers we have in our DIP budget."  (JTX 23)

67.   Johnson sent the draft e-mail initially to Victor and Rayzor, who had no comments.  (JTX 23; Johnson

15

Deposition Tr. at 141:23-142:7)

68.  As a result, the e-mail was sent virtually
unchanged to the same group of bondholder representatives
and others who had received the e-mail reporting on the May
10 meeting.  (JTX 24; JTX 18)

K.    Bankruptcy Filing and First Day Motions

69.  On May 13, 2003, at approximately 11:00 p.m.,
Orion filed its petition for relief under chapter 11 of the
Bankruptcy Code.  (Admitted Facts at ¶ L)

70.  Contemporaneously with the filing of the petition,
Orion also filed a Motion for Authority to Pay Certain
Fixed, Liquidated and Undisputed Prepetition Claims of Fire
Vendors, Mechanics and Materialmen (the "Critical Fire
Vendor Motion") and a separate Motion for Authority to Pay
Prepetition Obligations of Certain Critical Vendors and
Service Providers Pursuant to Sections 105(a) and 363(b) of
the Bankruptcy Code (the "Critical Vendor Motion") (M.D.I.
13 & 14)

71.  Orion filed two Critical  Vendor Motions because
of the necessity to track separately the costs associated
with the coker rebuild for insurance purposes.  (5/8/07 Tr.
[Rayzor] at 162:18-164:2; 5/09/07 Tr. [Victor] at 83:3-84:5;
5/9/07 Tr. [Bluth] at 11:20-12:2, 13:12-13:19)

72.  In the Critical Fire Vendor Motion, Orion clearly

16

expressed its need for authority to pay pre-petition claims

of Critical Fire Vendors even though the sale theoretically

could be closed without completion of the repairs:

> The expeditious completion of repairs to the
> coker unit and the Refinery's return to a fully
> operational condition . . . are critical to the
> Debtor's efforts to effect the sale of its
> business and to maximize value of its estate for
> the benefit of creditors and other stakeholders.
> First, under the terms of the Debtor's purchase
> agreement (the "Purchase Agreement") with Valero
> Energy Corporation . . . (the "Proposed
> Purchaser"), the refinery, including the coker
> unit, is required to be Operational (as defined in
> the Purchase Agreement) at closing and, if not
> Operational, a portion of the Preferred Stock (as
> defined in the Purchase Agreement) that is
> otherwise required to be delivered to the Debtor
> at closing will be held in escrow subject to the
> Proposed Purchaser's claims not otherwise covered
> by applicable insurance for costs incurred by the
> Proposed Purchaser in completing repairs to the
> coker unit. . . . Accordingly, <u>compelling
> reasons exist for the Debtor to take all
> reasonable steps to ensure the prompt repair of
> the coker unit and return of the Refinery to a
> fully operational condition</u>.

(M.D.I. 14 at ¶ 7 (emphasis added))

73.  The Critical Fire Vendor Motion sought authority

to pay up to $21.6 million in pre-petition unsecured claims

of vendors working on the fire repair, and the Critical

Vendor Motion sought authority to pay up to $5 million in

pre-petition claims of vendors identified as critical to

other aspects of the Refinery's operations.  (M.D.I. 14 &

13; Admitted Facts at ¶ M)

74.   While Orion proposed to condition payment of Critical Fire Vendors' claims on execution of a Trade Agreement, it specifically asked for authority to forego the requirement of a Trade Agreement, if circumstances warranted:

> Additionally, the Debtor hereby seeks authority to make payments on account of Fire Repair Claims, <u>even in the absence of a Trade Agreement</u>, if the Debtor determines, in its business judgment, that failure to pay the Fire Repair Claim is likely to result in irreparable harm to the Debtor's business operations and that it is not reasonably likely to be able to achieve a Trade Agreement with the relevant Fire Vendor.

(M.D.I. 14 at ¶ 12 (emphasis added))

75.   Finally, Orion made clear its need to offer payment of pre-petition amounts without regard to whether it could ask the Court to compel performance of a given agreement[5]:

> Although certain of the Fire Vendors may be party to enforceable agreements with the Debtor, the Debtor reasonably perceives a substantial risk that, notwithstanding such agreements and the effect of the automatic stay under section 362 of the Bankruptcy Code, certain of those Fire Vendors may fail to perform their obligations if not paid. <u>The Debtor can ill afford the uncertainty, cost</u>

---

[5]  As of May 13, 2003, there were Work Assignments issued and outstanding to Fluor covering work on the coker rebuild.   (5/9/07 Tr. [Coffee] at 60:22-61:10)

<u>and delay of seeking relief from this Court to
enforce such agreements and the automatic stay in
each such instance in which a Fire Vendor may fail
to perform its obligations</u>.  Accordingly, the
Debtor believes it is an appropriate exercise of
discretion for this Court to authorize payment of,
and the Debtor to pay, certain of the Fire Repair
Claims even when they arise under enforceable
agreements.

(M.D.I. 14 at 8, n. 6 (emphasis added))

76.  At the hearing on the Critical Fire Vendor Motion, Orion's bankruptcy counsel, Robert Dehney, stated Orion's intention to fund the payments to the Critical Fire Vendors by drawing against the DIP facility and repaying the draw when insurance proceeds were received.  (JTX 92 at 67:3-67:5; 5/9/07 Tr. [Victor] at 124:8-124:10)

77.  Dehney further clarified on the record that it was Orion's intent to use the authority of the Critical Fire Vendor Order to pay pre-petition amounts earned by a Critical Fire Vendor for both fire and non-fire-related work, if necessary to induce a Critical Fire Vendor to continue work on the coker rebuild.  (JTX 92 at 67:10-68:17; 5/9/07 Tr. [Victor] at 124:11-125:18)

78.  On May 15, 2003, the Court entered interim orders approving the Critical Fire Vendor and Critical Vendor Motions.  (M.D.I. 38 & 37; Admitted Facts at ¶ P)

79.  Those orders were approved as final orders

19

following a hearing on June 5, 2003, in which Fluor's counsel participated. (M.D.I. 204 & 205; Admitted Facts at ¶ P)

80. No budget was attached to the Critical Fire Vendor Order, and nothing in the Critical Fire Vendor Order restricted the amount that Orion was authorized to pay to any given Critical Fire Vendor, so long as amounts paid did not exceed $21.6 million in the aggregate absent further order of the Court. (M.D.I. 204 & 205; Admitted Facts at ¶ P)

81. In many instances, Orion paid Critical Fire Vendors amounts greater than Orion had originally projected for them in its internal budget. (JTX 52 at Ex. B; 5/9/07 Tr. [Victor] at 127:8-129:11)

82. For purposes of determining the amount due to each Critical Fire Vendor and each Critical Vendor, Orion prepared an internal budget from its accounts payable register, which reflected the unpaid invoices received from those vendors. (5/8/07 Tr. [Rayzor] at 164:21-165:6; 5/9/07 Tr. [Victor] at 86:1-86:5)

83. As of May 3, 2003, the date on which the Critical Vendors' budgets were prepared, Orion had unpaid invoices totaling $15,316,181 from the Critical Fire Vendors. (JTX

52 at Ex. A; 5/8/07 Tr. [Rayzor] at 167:3-167:6; 5/9/07 Tr. [Victor] at 112:8-112:10)

84.  Orion recognized that there were invoices in process that were not on the May 3 accounts payable records, and consequently, after consulting with the coker rebuild project team, estimated the total unpaid pre-petition coker rebuild costs were $21.6 million for purposes of its Critical Fire Vendor Motion and DIP budget.  (JTX 43; JTX 52 at ¶ 10; 5/9/07 Tr. [Victor] at 112:2-112:20; 5/8/07 Tr. [Rayzor] at 164:21-165:6, 167:7-168:6)

85.  Fluor was identified as being critical to the coker rebuild and was, therefore, included on Orion's internal budget for Critical Fire Vendors in a total amount of approximately $3.7 million.  (JTX 52 at Ex. A; 5/8/07 Tr. [Rayzor] at 168:7-168:25; 5/9/07 Tr. [Bluth] at 20:7-20:10)

86.  Fluor was not considered to be critical to the turnaround (which was already complete) or to general maintenance and was not, therefore, included on the list of Critical Vendors.  (JTX 91; 5/8/07 Tr. [Rayzor] at 170:19-170:22; 5/9/07 Tr. [Bluth] at 20:11-20:17)

87.  Orion's management was instructed to keep the Critical Vendors' budgets secret and to disclose them only on a "need to know" basis.  (5/9/07 Tr. [Victor] at 119:13-

119:17)

L.    <u>Fluor Considers its Options</u>

88.    On the morning of May 14, 2003, Fluor's senior management met to consider its options, which included completing the coker rebuild work, pulling its work force off the site, withholding certain welding certifications that Orion needed to restart the Refinery, filing a supplemental lien for the maintenance and turnaround expenses which were omitted from its initial lien filing, and discussing the matter with the proposed purchaser of the Refinery who was a "very good client" of Fluor.  (JTX 5; JTX 10; JTX 14; JTX 30; JTX 34; JTX 56; 5/7/07 Tr. [Stover] at 86:17-87:8; 5/7/07 Tr. [Constable] at 117:11-117:15, 126:23-127:9, 130:23-131:16)

89.    Fluor was prepared to walk off the job and had been involved in prior situations when the work force was pulled from the site for non-payment, in both bankruptcy and non-bankruptcy situations.  (JTX 9; 5/7/07 Tr. [Stinger] at 65:13-65:20; 5/7/07 Tr. [Constable] at 152:19-152:24; 5/7/07 Tr. [Stover] at 106:12-106:17; 5/8/07 Tr. [Penn] at 74:17-74:24)

90.    If Fluor had walked off the job, Fluor's representatives estimated it could easily have added six

months to the project and doubled its cost, while Orion admitted that there would have been a delay of at least two to three weeks. (5/7/07 Tr. [Stinger] at 56:9-56:17; 5/9/07 Tr. [Coffee] at 63:11-63:23)

91. If the welding certifications had been withheld by Fluor, the welding would have had to be redone and re-certified causing further delay. (5/9/07 Tr. [Coffee] at 66:21-67:5, 76:17-76:20)

92. After some discussion, the May 14 meeting was adjourned to enable the participants to gather additional information about the Critical Fire Vendor assurances made by Orion to enable the group to make an informed decision. (5/7/07 Tr. [Stinger] at 47:23-51:4; 5/7/07 Tr. [Stover] at 83:20-88:16; 5/7/07 Tr. [Constable] at 125:21-127:22; 5/8/07 Tr. [Pozzo] at 15:18-19:14; 5/8/07 Tr. [Penn] at 72:3-75:19)

M.    Post-Petition Representations

93. Later on May 14, 2003, Bluth and Troy Champeaux, head of Orion's maintenance department responsible for overseeing the coker rebuild, participated in a conference call with a number of Fluor representatives. In that call, they advised that Orion had filed for bankruptcy protection, the Refinery was being sold as part of the bankruptcy process, Fluor was considered a Critical Fire Vendor, a

motion had been filed seeking Court approval to pay Critical
Fire Vendors their pre-petition claims, and it was important
to Orion that Fluor continue to work on the coker rebuild.
(5/9/07 Tr. [Bluth] at 38:4-39:4; 5/8/07 Tr. [Pozzo] at
20:24-21:3; 5/7/07 Tr. [Rusich] at 172:11-173:5, 174:1-
174:5)

94.   Bluth and Champeaux expressly confirmed, once
again, that it was Orion's intention that Fluor be made
whole for all work done to date (including the turnaround
and maintenance work) and that payment could be expected in
a couple weeks.  (JTX 12; JTX 29 at 2; 5/7/07 Tr. [Rusich]
at 172:11-174:5;  5/8/07 Tr. [Penn] at 75:20-83:1; 5/8/07
Tr. [Pozzo] at 19:15-24:11;  5/7/07 Tr. [Stover] at 88:17-
90:3; 5/7/07 Tr. [Stinger] at 51:5-52:17)

95.   Bluth and Champeaux also explained that while the
Debtor had included Fluor on the list of Critical Fire
Vendors, Fluor needed to file invoices for that work.  (JTX
16; JTX 29 at 2; 5/8/07 Tr. [Pozzo] at 50:22-51:2)

96.   Fluor was advised that Victor had been retained as
the Debtor's Chief Restructuring Officer to help with the
bankruptcy process and would soon be in contact with Fluor.
(JTX 16; JTX 29 at 2; 5/8/07 Tr. [Penn] at 78:1-78:8; 5/8/07
Tr. [Pozzo] at 51:3-51:9)

97.  On May 16, 2003, Victor and Rayzor participated in a status call with various Fluor representatives in which they reported that the Court had approved the debtor-in-possession financing, the Critical Fire Vendor and the Critical Vendor Motions, and that they were setting up processes for payment to the listed vendors.  (JTX 16 at 1; JTX 13; 5/8/07 Tr. [Pozzo] at 22:13-23:19; 5/8/07 Tr. [Penn] at 84:2-84:14)

98.  While Victor gave a consultant's "standard caveat" that he did not want to raise unrealistic expectations, Victor and Rayzor stated that a total of $21.6 million had been approved for Critical Fire Vendors and that Orion was close to Fluor's estimate of the pre-petition amounts owed to Fluor.  They stated that the cap for the Critical Fire Vendors' claims was based on invoices received through May 3 and that the "remainder [would be] caught in [the] post-petition budget."  (JTX 16)

99.  Victor and Rayzor reiterated that Fluor could expect payment of amounts due for pre-petition work by the following week.  (JTX 16 at 1; JTX 13; 5/8/07 Tr. [Pozzo] at 22:8-24:11, 25:13-25:18, 28:5-28:23; 5/8/07 Tr. [Penn] at 83:10-84:24)

100. The parties scheduled a meeting for May 20, 2003,

25

to "agree on amounts" and to discuss a "path forward" for completion of the coker rebuild. (5/7/07 Tr. [Constable] at 136:11-136:15; 5/8/07 Tr. [Pozzo] at 54:3-54:6; 5/7/07 Tr. [Rusich] at 175:21-176:1)

101. Fluor's senior management met again late Friday, May 16. Because Orion had made a commitment to pay Fluor in full and the Court had approved the Critical Fire Vendor Motion, Fluor decided to continue the coker rebuild without interruption as quickly as possible. (5/7/07 Tr. [Constable] at 133:1-137:15; 5/7/07 Tr. [Stover] at 91:19-93:4; 5/8/07 Tr. [Pozzo] at 25:19-26:5)

N.    <u>May 20 Meeting</u>

102. On May 20, 2003, a meeting was held at the Refinery between Victor and Rayzor for Orion and several representatives of Fluor, including inside and outside counsel. (5/8/07 Tr. [Rayzor] at 173:23-174:13; 5/7/07 Tr. [Rusich] at 188:4-188:15)

103. The meeting began with a report by Fluor on the status of the project, confirming that the project was on schedule for mechanical completion in the first week of June. (5/8/07 Tr. [Penn] at 85:9-85:18, 87:11-87:15)

104. Fluor then presented its analysis of the

pre-petition amounts (billed and unbilled) which Fluor
believed it was owed for the fire repair ($19 million),
maintenance and turnaround ($8.8 million), and the amounts
Fluor forecasted would be incurred on a post-petition basis.
(JTX 7 at 2; JTX 14; 5/8/07 Tr. [Penn] at 87:11-87:15;
5/8/07 Tr. [Rayzor] at 175:2-175:7)

105. In response, Victor explained that, based on
Fluor's invoices and Orion's accounts payable register,
Fluor had been included on the internal list of Critical
Fire Vendors at a total of only $3.7 million. (5/8/07 Tr.
[Rayzor] at 175:8-175:23; 5/9/07 Tr. [Victor] at 96:12-
96:21; 5/7/07 Tr. [Rusich] at 176:25-177:11)

106. Victor stated that the parties needed to reconcile
the amount due, but in order to do so, Orion needed to
receive invoices for the pre-petition amounts. The parties
then discussed the logistics of invoicing. (5/9/07 Tr.
[Victor] at 96:12-96:25, 97:10-97:15)

107. Victor and Rayzor told the Fluor representatives
that if they submitted the invoices and they were properly
documented and approved, there would be no problem because
it was Orion's intention to keep Fluor whole if the repairs
were completed. (5/8/07 Tr. [Penn] at 89:6-89:11)

108. Although the discussion remained professional, the

revelation of the difference in the parties' positions
caused a fair amount of consternation and angst on the part
of Fluor's representatives in attendance.  (5/9/07 Tr.
[Victor] at 96:16-96:25; 5/8/07 Tr. [Penn] at 101:1-101:6)

109. At no time during that meeting or at any time
prior to completion of the coker rebuild, did Victor,
Rayzor, or any other representative of Orion tell Fluor that
the amount shown on the May 3 accounts payable aging report
was all that Fluor could expect to be paid for work done
pre-petition.  (5/8/07 Tr. [Penn] at 89:19-89:25; 5/7/07 Tr.
[Rusich] at 182:8-182:13; 5/8/07 Tr. [Rayzor] at 207:12-
207:20)

110. Despite failing to reach an agreement on the
amount of the pre-petition claim, Victor stated that he
would be willing to consider virtually any payment
arrangement (such as COD or cash in advance) that Fluor
wanted on a post-petition basis, because Fluor was critical
to the coker rebuild.  (5/9/07 Tr. [Victor] at 97:22-98:24)

O.    Committee Formation Meeting

111. On May 22, 2003, Fluor's Controller of Operations
and Maintenance, Edward Penn, attended the formation meeting
of the Orion Creditors' Committee as Fluor's representative,
where he was introduced to Orion's bankruptcy counsel,

28

Dehney.  At that time, Dehney asked why Penn was there, stating that it was Orion's intention to keep Fluor whole if it finished the coker rebuild so Orion could sell the Refinery.   (JTX 1 at 9; JTX 15; JTX 35; 5/8/07 Tr. [Penn] at 90:2-91:6;  5/7/07 Tr. [Constable] at 143:13-145:7; 5/7/07 Tr. [Stover] at 94:3-95:14; 5/8/07 Tr. [Pozzo] at 35:5-37:10)

P.    Completion of Coker Rebuild

112. Mechanical completion of repairs to the coker unit occurred on June 5, 2003, three weeks after Orion filed its bankruptcy petition.  (Admitted Facts at ¶ S)


113. Fluor received accolades from Orion's project manager for the coker rebuild, and Orion has admitted that it was satisfied with Fluor's performance.  (JTX 48 at ¶ 38; 5/7/07 Tr. [Stover] at 104:8-104:11)

Q.    Efforts to Settle

114. On or about June 6, 2003, Fluor's in-house counsel, John Reynolds, and Penn prepared a presentation to senior management on the status of the Orion situation. (JTX 76; 5/8/07 Tr. [Penn] at 101:7-102:8)

115. As part of the June 6 presentation, Reynolds and Penn reviewed the status of Fluor's lien and the discussions

29

relative to Orion's proposal to pay Fluor $3.1 million, and explained that "[Fluor] is pushing back on Orion saying that we represent 80-90% of the costs and should [be] somewhere around 80-90% of the total pool" of $21.6 million. (JTX 76 at 12)

116. Reynolds and Penn reported that Fluor was "seeing some verbal acknowledgement [sic] we are more than $3.1 but nothing in writing or firm," and concluded that Fluor should "get back with Orion and press the case to increase [its] share of [the] pot," and "determine if any additional motions need to be filed with the court." (JTX 76 at 14)

117. Penn "never followed through with" that recommendation. (5/8/07 Tr. [Penn] at 108:14-109:5; 5/9/07 Tr. [Victor] at 100:3-100:6)

118. The June 6 presentation also contained an analysis of Fluor's likely exposure ($8.1 million shortfall which would be waived) if it attempted to collect as a Critical Fire Vendor. (JTX 76 at 18)

119. If Fluor pursued its lien rights, on the other hand, it concluded that there would be an anticipated $7 million shortfall which would be part of the unsecured creditors' pool. (JTX 76 at 18)

120. The recommendation of the June 6 presentation was that Fluor should pursue a "global settlement" with Orion in the amount of $28.1 million.  (JTX 76 at 20-22)

121. Consistent with that recommendation, on June 11, 2003, Fluor sent a draft settlement proposal to Orion and requested a meeting with Victor to discuss the possibility of a global settlement.  (JTX 87; 5/9/07 Tr. [Victor] at 100:10-100:13)

122. Victor initially indicated a willingness to support Fluor's proposal of a global settlement.  (5/8/07 Tr. [Penn] at 95:15-95:19)

R.    Sale of the Refinery

123. On July 1, 2003, Orion sold substantially all its operating assets, including the Refinery and coker unit, to Valero Refining-New Orleans, LLC, a subsidiary of Valero Energy Corporation (collectively "Valero") for cash, preferred stock, and additional consideration, having an aggregate value in excess of $600 million, primarily for the benefit of Orion's bondholders.  (M.D.I. 1241 at 6; 5/9/07 Tr. [Victor] at 129:24-130:2)

124. In order to sell the Refinery free and clear of Fluor's lien claim, the order approving the sale established

31

an escrow (the "Fluor Escrow") to which Fluor's lien claim attached.  (M.D.I. 336 at 38)

S.    Impasse

125. After the sale closed in July, Victor declined to address the matter further because of the open issues relative to the ongoing reconciliation of Fluor's pre-petition claim, the need to investigate Fluor's liens, and Fluor's potential liability for the January 29, 2003, fire. (5/9/07 Tr. [Victor] at 100:3-101:5)

126. On August 17, 2005, Orion filed an action against Fluor in the 29th Judicial District Court for the Parish of St. Charles, Louisiana, alleging that the Refinery fire was caused by the negligence and other wrongful acts of Fluor.

127. Orion has acknowledged that until its claims are liquidated, no right of offset exists.  (Amended Pretrial Order at 3, lines 16-17)

T.    Reconciliation of Amount Due

128. Immediately after the May 20 meeting, invoicing for the pre-petition work became Fluor's highest priority; within a few days, Fluor began submitting its invoices for its pre-petition work and finished submitting them by the end of the first week of June 2003.  (5/8/07 Tr. [Pozzo] at 47:23-48:4; 5/9/07 Tr. [Victor] at 99:17-100:21)

32

129. A Fluor representative spent the next several weeks at the Orion facility working through all of the invoices, line by line, to ensure they were accurate. (5/7/07 Tr. [Rusich] at 179:7-179:9; 5/8/07 Tr. [Pozzo] at 37:11-37:19)

130. Once Fluor completed the coker rebuild, the reconciliation process slowed because Orion did not devote any time to the process. (5/8/07 Tr. [Penn] at 94:23-95:2)

131. Fluor became so frustrated that it offered to pay the cost of hiring additional Orion personnel to accelerate the reconciliation. (5/8/07 Tr. [Penn] at 96:20-97:6; 5/8/07 Tr. [Krehmeier] at 129:25-130:11)

132. Because it intended to include pre-petition amounts owed to Fluor in its proof of loss for its insurance claim, Orion continued sporadic participation in the reconciliation process, which continued through at least October 2003. (JTX 41; 5/8/07 Tr. [Krehmeier] at 132:14-133:4, 144:17-144:21; 5/8/07 Tr. [Pozzo] at 48:8-48:15; 5/8/07 Tr. [Rayzor] at 209:23-210:1)

133. Despite the fact that nothing has been paid to Fluor for any pre-petition work, Orion included the full amount of Fluor's pre-petition claim in the insurance proof of loss it filed post-petition for the coker repairs.

33

(5/8/07 Tr. [Rayzor] at 209:23-210:1)

134. In the fall of 2003, Fluor and Orion eventually reached a meeting of the minds as to the pre-petition amount owed to Fluor ($20,657,860.58) subject only to any amounts paid by Orion to subcontractors of Fluor for pre-petition work performed which should be credited against the amount owed to Fluor. (5/8/07 Tr. [Rayzor] at 208:10-208:17; Admitted Facts at ¶ V)

135. At the trial, Orion presented no evidence of any such credits against the amount due to Fluor.

136. At trial, Victor acknowledged that Fluor should be paid the reconciled amount of its pre-petition claim, at least to the extent of the unspent amount (approximately $11.7 million) of the payments authorized by the Critical Fire Vendor Order. (5/9/07 Tr. [Victor] at 130:3-131:25)

137. Of the 108 Critical Fire Vendors, Orion reached agreement with 43 vendors, who executed a written agreement and release of liens and were paid $9,862,689.01 of the $21.6 million authorized by the Critical Fire Vendor Order. (JTX 52 at Ex. B; 5/9/07 Tr. [Victor] at 85:1-85:18, 89:11-92:21, 93:20-93:25)

U.   Confirmation of the Plan

138. Orion filed its amended plan of liquidation (the

34

"Plan") on or about May 12, 2004.   (M.D.I. 1242; Admitted

Facts at ¶ U)

139.  Pursuant to the Plan, the residual interest of the

Orion bankruptcy estate in the Fluor Escrow was transferred

to the Trust, which was created and administered primarily

for the benefit of Orion's bondholders.   (Disclosure

Statement at Section II, C)

140.  Fluor filed an objection to confirmation of the

Plan arguing, _inter alia_, that sufficient protection was not

afforded in the Plan for claims asserted under Fluor's

pending Motion for Relief.   (Admitted Facts at ¶ U)


141.  The Plan confirmation hearing was held on June 24,

2004.   (Admitted Facts at ¶ U)

142.  At the Confirmation Hearing, the Court

acknowledged the legitimacy of Fluor's concerns and resolved

its objection by amending the proposed Confirmation Order to

provide that the Fluor Escrow, previously established for

its lien claims, "shall be paid on account of Fluor's Liens

and Claims if and to the extent that, by Final Order or

Orders, the Bankruptcy Court . . . directs that payment be

made to Fluor pursuant to the Motion For Relief . . . ."

(JTX 50 at ¶ 52; Admitted Facts at ¶ U)

35

143. As of March 31, 2007, the balance in the Fluor Escrow was $22,486,419.84.  (M.D.I. 1880 at 2)

V.   Summary Facts

144. The coker rebuild being performed by Fluor was critical to the bankruptcy plan; it was critical to the sale of the Refinery; it was critical to cash; "[i]t was critical, period." (Johnson Deposition Tr. at 97:20-98:5; 5/9/07 Tr. [Victor] at 103:15-103:22)

145. There was never any doubt that Fluor was a Critical Fire Vendor and would be on the Critical Fire Vendor list.  As the general contractor, Fluor was in fact the Critical Fire Vendor for the coker rebuild.  (5/9/07 Tr. [Victor] at 104:7; 5/8/07 Tr. [Rayzor] at 190:10-190:12; 5/9/07 Tr. [Bluth] at 20:7-20:10)

146. Orion's Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, and Chief Restructuring Officer all believed, as of the Petition Date, that substantially all the coker rebuild budget was intended to pay Fluor or its subcontractors.  (Johnson Deposition Tr. at 124:11-125:22; 5/9/07 Tr. [Bluth] at 35:25-36:7; 5/8/07 Tr. [Rayzor] at 197:9-197:24; 5/9/07 Tr. [Victor] at 140:6-140:9)

147. Repeated commitments were given to Fluor by Orion

36

officers that Orion would make it "whole" (i.e. pay its pre-
petition claims in full) in return for completion of the
coker rebuild. (JTX 9; 5/7/07 Tr. [Stinger] at 39:4-39:6,
44:12-44:19; 5/7/07 Tr. [Stover] at 82:3-82:5; 5/7/07 Tr.
[Constable] at 124:12-124:22; 5/8/07 Tr. [Penn] at 69:3-
69:8; 5/8/07 Tr. [Rayzor] at 154:19-154:25; 5/9/07 Tr.
[Bluth] at 29:25-30:12)

148. Although Victor and Rayzor were copied on numerous
e-mails (sent by Johnson, Bluth and Dehney to Orion's
bondholders and others) stating that such commitments were
being made to Fluor in order to address concerns about
possible "demobilization" of the coker rebuild effort, there
is no evidence of any effort by Victor or Rayzor to correct
the misstatements. (JTX 17, JTX 18, JTX 19, JTX 20, JTX 21,
JTX 22, JTX 23, JTX 24; 5/9/07 Tr. [Victor] at 103:15-
103:22; 5/8/07 Tr. [Rayzor] at 190:8-190:12)

149. Although Orion's CEO, Johnson, and COO, Bluth,
believed at the time those commitments were being given that
Orion's intent was to make Fluor whole, Victor did not agree
that that was Orion's intent and believed that the
statements by Bluth to Fluor could have been misleading.
(5/9/07 Tr. [Victor] at 107:14-107:17, 108:11-108:19; 5/8/07
Tr. [Rayzor] at 205:8-206:16)

37

150. Nothing in the Critical Fire Vendor Order conditioned Orion's authority to make payment to Fluor on execution of a Trade Agreement.

151. Nothing in the Critical Fire Vendor Order limits the amount Orion was authorized to pay any Critical Fire Vendor, so long as aggregate payments did not exceed $21.6 million absent further order of this Court.

152. Nothing in the Critical Fire Vendor Order is inconsistent with Orion's intent (expressed on the record at the hearing to approve the Critical Fire Vendor Motion) to use the authority of the Order to pay pre-petition amounts for both fire-related and non-fire-related work, to assure the coker rebuild was timely completed.

Dated: July 20, 2007          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

SERVICE LIST

William H. Sudell, Esquire
Donna L. Culver, Esquire
Thomas W. Briggs, Jr., Esquire
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Counsel for the ORC Distribution Trust

Francis A. Monaco, Esquire
Kevin J. Mangan, Esquire
Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Counsel for Fluor Enterprises, Inc.

Joseph B.C. Kluttz, Esquire
Kennedy Covington, Esquire
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202
Counsel for Fluor Enterprises, Inc.

**EXHIBIT C**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ORION REFINING CORPORATION, | ) Case No. 03-11483(MFW) |
| | ) |
| Debtor. | ) Related Documents: 1283 and |
| _____ | )                              1788 |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary No. 04-52447(MFW) |
| | ) |
| ORION REFINING CORPORATION, | ) |
| CYPRESS ASSOCIATES, LLC as | ) |
| ORC DISTRIBUTION TRUST | ) |
| REPRESENTATIVE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| ORION REFINING CORPORATION, | ) |
| | ) |
| Counter-Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
| Counter-Defendant. | ) |

<u>**OPINION**</u>[1]

Before the Court are the Complaint and Motion of Fluor

Enterprises, Inc. ("Fluor") seeking payment of its pre-petition

claims totaling $20,657,860.58 on theories of breach of contract,

promissory estoppel, misrepresentation, and under the Critical

_____

[1]  This Opinion, and the accompanying Findings of Fact
("FOF"), constitute the findings of fact and conclusions of law
of the Court pursuant to Rule 7052 of the Federal Rules of
Bankruptcy Procedure.

Fire Vendor Order entered by the Court early in this chapter 11 case.  The ORC Distribution Trust (the "Trust") opposes the relief sought.  For the reasons set forth below, the Court will grant the relief requested by Fluor and direct the payment of its claims in full.

I.    BACKGROUND

      The background of this case is reflected in the Court's Opinion dated May 9, 2006, and in the Court's Findings of Fact ("FOF") which are attached hereto and incorporated herein by reference.  A summary of the relevant facts is presented here.

      Orion Refining Corporation ("Orion") operated an oil refinery in Norco, Louisiana (the "Refinery").  On May 20, 2002, it executed a Master Service Agreement (the "MSA") with PSC Industrial Outsourcing, Inc. ("PSC"), which was subsequently assigned to Fluor on March 3, 2003.  The MSA called for PSC (and Fluor) to perform various services, including management, mechanical, industrial, and oil spill/hazardous material emergency response services at the Refinery.

      On January 29, 2003, the Refinery (and principally its coker unit) was damaged by fire.  As a result, Orion determined to expand PSC's duties under the MSA to make it the general contractor for the repair of the coker unit.  Orion thereafter issued hundreds of Work Assignments to PSC, and later to Fluor,

2

under the MSA for the repair of the coker unit.

Orion filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on May 13, 2003 (the "Petition Date"). Orion also filed a Motion for Authority to Pay Certain Fixed, Liquidated and Undisputed Prepetition Claims of Fire Vendors, Mechanics and Materialmen (the "Critical Fire Vendor Motion") and a separate Motion for Authority to Pay Prepetition Obligations of Certain Critical Vendors and Service Providers Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code (the "Critical Vendor Motion"). (FOF 71)

As the general contractor on the coker rebuild, Fluor was the largest and most important of the Critical Fire Vendors. (FOF 31, 33-34, 53-54, 57, 63-64, 83, 85, 95, 97-98, 105, 111, 136, 144-46)  On numerous occasions (both before and after the bankruptcy case was filed), Orion emphasized to Fluor the importance of Fluor staying on the job and finishing the coker rebuild in a timely fashion. (FOF 53-54, 63-64, 93, 95, 97-98, 103-107, 111)  Orion's representatives told Fluor that if it finished the coker rebuild, its pre-petition claims would be treated as Critical Fire Vendor claims and paid in full. (FOF 53-54, 63-64, 93, 95, 97-98, 103-107, 111)  Fluor continued on the job and the coker rebuild was finished ahead of schedule on June 5, 2003, approximately three weeks after the Petition Date. (FOF 112-13)

3

Shortly after it had filed for bankruptcy, Orion filed a Motion for approval of a sale of the Refinery to Valero Energy Corporation and Valero Refining - New Orleans, LLC (collectively "Valero").  The purchase agreement contemplated that the Refinery would be repaired before closing on the sale; if not, funds would be escrowed until completion.  The Court granted the sale motion on June 26, 2003.

After the sale closed in early July 2003, Orion refused to pay Fluor's pre-petition claims, asserting that it had claims against Fluor as well.  (FOF 125)  On August 17, 2005, Orion filed an action against Fluor in Louisiana, alleging that the Refinery fire was caused by the negligence and other wrongful acts of Fluor.  (FOF 126)

On February 4, 2004, Fluor filed a Complaint against Orion to recover its pre-petition claims for fire restoration, maintenance, and the work done on the coker rebuild.  (FOF 4) The Complaint contained four counts.  Count I asserted a mechanics' lien against the Refinery under the Louisiana Private Works Act and, thus, the right to sale proceeds placed in escrow. (Id.)  Count II alleged fraud and misrepresentation.  (Id.) Count III asserted promissory estoppel.  (Id.)  Count IV asserted a constructive trust against the sale proceeds.  (Id.)  On June 3, 2004, Fluor filed a Motion for Relief from Previously Entered Critical Fire and Trade Vendor Orders ("Motion for Relief"),

which also sought payment of the pre-petition claims.  (FOF 7)
The Trust[2] opposed both the Motion and the Complaint.  (FOF 5,8)

In an Opinion dated May 9, 2006, the Court denied Fluor's
motion for partial summary judgment and granted the Trust's
motion for partial summary judgment on Counts I and IV of the
Fluor Complaint.  (FOF 10)  The Court held that Fluor could not
recover under Count I because under the MSA it had waived its
right to impose a mechanics' lien.  <u>Fluor Enterprises, Inc. v.
Orion Refining Corp. (In re Orion Refining Corp.)</u>, 341 B.R. 476,
481 (Bankr. D. Del. 2006).  The Court further concluded that
Count IV failed because Louisiana law (the law applicable to the
issue) did not recognize the remedy of constructive trust.  <u>Id.</u>
at 482-85.[3]

In an Order dated July 27, 2006, the Court determined that
Fluor could continue to prosecute its action asserting that Orion
was obligated to pay Fluor's pre-petition claims in full based on
its contention that (1) there was an agreement between Fluor and
Orion that Fluor was a Critical Fire Vendor and that its pre-

---

[2] On May 12, 2004, Orion was succeeded by the Trust under
the Amended Plan of Liquidation.  The Trust also filed a
counterclaim in the Complaint, asserting entitlement to recover
alleged preferences in the amount of $1,951,888.47.  The Trust
has withdrawn that counterclaim.

[3] Fluor appealed the Court's May 10 Opinion and Order.  On
August 11, 2006, the District Court dismissed the appeal, without
prejudice, because the May 10 Opinion and Order disposed of fewer
than all the claims in the adversary proceeding.

petition claims would be paid in full if it completed the coker
rebuild or (2) Orion misrepresented that Fluor would be paid in
full when the coker rebuild was done and Fluor detrimentally
relied on those misrepresentations by completing that work.  The
Court ordered a consolidated trial of Fluor's Complaint and its
Motion for Relief on those two theories.

Trial was held on May 7, 8, and 9, 2007.  Post-trial briefs
were filed by the parties on June 20 and July 5, 2007.  The
matter is ripe for decision.


II.  JURISDICTION

This is a core proceeding, and the Court has subject matter
jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and
157(b)(2)(A), (B), & (O).


III. DISCUSSION

A.   Choice of Law

Fluor's claims for breach of contract and misrepresentation
arise under state common law.  See, e.g., United States v. Texas,
507 U.S. 529, 534 (1993) (holding that fraud claims arise under
state law); In re III Enterprise, Inc., 163 B.R. 453, 459 (Bankr.
E.D. Pa. 1994) (concluding that issue of whether a valid contract
exists is a question of state law).

Both federal common law and Delaware law apply section 188 of the Restatement (Second) Conflict of Laws.  <u>See, e.g.</u>, <u>In re Miller</u>, 292 B.R. 409, 413 (B.A.P. 9th Cir. 2003); <u>Oliver B. Cannon & Son v. Dorr-Oliver, Inc.</u>, 394 A.2d 1160, 1166 (Del. 1978); <u>Viking Pump, Inc. v. Liberty Mut. Ins. Co.</u>, No. Civ. A. 1465-VCS, 2007 WL 1207107, at *26 n. 113 (Del. Ch. Apr. 13, 2007).  Section 188 of the Restatement weighs various factors in determining which law to apply, including: (1) where the contract was negotiated, (2) the place of performance, (3) the location of the subject matter of the contract, and (4) the place of incorporation and place of business of the contracting parties. <u>See, e.g.</u>, <u>Viking Pump</u>, 2007 WL 1207107, at *26 n. 113; <u>Miller</u>, 292 B.R. at 413.  In this case, those factors weigh in favor of applying Louisiana law.  The statements by representatives of Orion which support Fluor's claims were all made in Louisiana. Fluor's performance occurred in Louisiana.  The subject of the alleged agreement was the coker unit, which was located at the Refinery in Louisiana.  Orion's business was at all relevant times located in Louisiana.

Consequently, under both federal common law and Delaware's conflict of laws rules, Fluor's claims are governed by Louisiana law.  <u>See also</u> <u>Orion Ref. Corp.</u>, 341 B.R. at 484-85.

B.    Agreement to Pay Pre-Petition Claims

Fluor asserts that an agreement was reached between it and Orion whereby Orion agreed to pay Fluor's pre-petition claims in full if Fluor completed the coker rebuild without delay.  Fluor presented evidence of numerous conversations and meetings it had with Orion's representatives establishing that agreement.  (FOF 53-54, 63-64, 93, 95, 97-98, 103-07, 111)

Under Louisiana law, there are four elements necessary for a contract: (1) capacity, (2) consent, (3) lawful cause, and (4) an object.  La. Civ. Code Ann. arts. 1918, 1927, 1966, 1971 (1987).  See, e.g., Prestridge v. Elliot, 847 So. 2d 789, 791-92 (La. Ct. App. 2003).  Fluor bears the burden of establishing all four elements by a preponderance of the evidence.  See, e.g., Adams v. Commercial Nat. Bank in Shreveport, 661 So. 2d 636, 639 (La. Ct. App. 1995).

1.    Capacity

The oral statements upon which Fluor relies are primarily statements of Eric Bluth, Orion's Chief Operating Officer.  (FOF 53-54, 63-64, 93, 95, 97-98, 103-07, 111)  As COO and the senior client representative for Orion in its relationship with Fluor, Bluth had actual authority to bind Orion.  "All persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting."  La. Civ. Code Ann. art. 1918 (1987).  "The principal may confer on

8

the mandatary [agent] general authority to do whatever is
appropriate under the circumstances." La. Civ. Code Ann. art.
2994 (2005). "The mandatary [agent] may perform all acts that
are incidental to or necessary for the performance of the
mandate. The authority granted to a mandatary [agent] to perform
an act that is an ordinary part of his profession or calling, or
an act that follows from the nature of his profession or calling,
need not be specified." La. Civ. Code Ann. art. 2995 (2005).
"The principal is bound to perform the contract that the
mandatary [agent], acting within the limits of his authority,
makes with a third person." La. Civ. Code Ann. art. 3020 (2005).
See generally Restatement (Third) of Agency § 2.01 (2006) ("An
agent acts with actual authority when, at the time of taking
action that has legal consequences for the principal, the agent
reasonably believes, in accordance with the principal's
manifestations to the agent, that the principal wishes the agent
to act.").

Further, as COO and the main Orion representative dealing
with Fluor on the coker rebuild, Bluth had apparent authority to
bind Orion on matters relating to that subject. "One who causes a
third person to believe that another person is his mandatary
[agent] is bound to the third person who in good faith contracts
with the putative mandatary [agent]." La. Civ. Code Ann. art.
3021 (2005). See generally Restatement (Third) of Agency § 2.03

(2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").

The Trust contends that when Steven L. Victor was hired as Orion's CRO, Victor instructed Orion's senior management that they did not have the authority to make any deals with vendors regarding their pre-petition claims. The Trust suggests that Victor alone had the authority to negotiate with Critical Fire Vendors. Therefore, it argues that the statements on which Fluor relies were misunderstood by Fluor or could not reasonably have been relied upon by Fluor.

The Court disagrees. Although Victor was installed as Orion's CRO in April 2003, that had no effect on the corporate authority of other members of Orion's senior management, including Bluth. (FOF 46) Fluor was told that Victor would be dealing with Orion's bankruptcy case, but that did not deprive Orion's other officers of their authority, even in matters involved in the bankruptcy case. (FOF 46)

Additionally, Bluth's statements to Fluor were ratified by other members of Orion's senior management including Clark Johnson, Orion's Chief Executive Officer, Richard Rayzor, Orion's Chief Financial Officer, and even by Victor himself. (FOF 93-95,

97-99, 105-10, 146-48)  <u>See generally</u> Restatement (Third) of
Agency § 4.01 (2006) ("Ratification is the affirmance of a prior
act done by another, whereby the act is given effect as if done
by an agent acting with actual authority. . . .  A person
ratifies an act by (a) manifesting assent that the act shall
affect the person's legal relations, or (b) conduct that
justifies a reasonable assumption that the person so consents.").

In calls and meetings with Fluor after Bluth had promised
that Fluor's pre-petition claims would be paid in full, neither
Rayzor nor Victor rescinded Bluth's statements.  (FOF 109, 148)
Specifically, in the May 16 and 20 discussions, neither Victor
nor Rayzor told Fluor that its pre-petition claims would not be
paid in full.  (FOF 97-99, 105-09)  While Victor told Fluor that
it was on the Critical Fire Vendor list for only $3.7 million, he
suggested that Fluor submit its invoices so they could be
reconciled and paid.  (FOF 106-07)  This reiterated and
reinforced the statements made by Bluth: that if Fluor continued
with the coker rebuild, then Fluor would be paid its pre-petition
claims in full, subject only to Fluor submitting and reconciling
its invoices.  (FOF 53-54, 63-64, 93, 95, 97-98, 103-07, 111)

    2.  <u>Consent</u>

The element of consent requires an offer and an acceptance.
La. Civ. Code Ann. art. 1927 (1987) ("A contract is formed by the
consent of the parties established through offer and acceptance.

Unless the law prescribes a certain formality for the intended
contract, offer and acceptance may be made orally, in writing, or
by action or inaction that under the circumstances is clearly
indicative of consent.  Unless otherwise specified in the offer,
there need not be conformity between the manner in which the
offer is made and the manner in which the acceptance is made.").
See, e.g., Imperial Chemicals Limited v. PKB Scania, 929 So. 2d
84, 90 (La. Ct. App. 2006); Grasso v. First USA Bank, 713 A.2d
304, 308 (Del. Super. Ct. 1998).  See generally Restatement
(Second) of Contracts §§ 24 & 32(2) (1981) ("An offer is the
manifestation of willingness to enter into a bargain, so made as
to justify another person in understanding that his assent to
that bargain is invited and will conclude it," and "[t]he terms
of a contract are reasonably certain if they provide a basis for
determining the existence of a breach and for giving an
appropriate remedy.").

Fluor contends that Orion made an offer to Fluor, in their
post-petition calls and meetings, that Orion would pay all
amounts accrued pre-petition as calculated under the MSA if Fluor
completed the coker rebuild.  (FOF 53-54, 63-64, 93, 95, 97-98,
103-07, 111)  Fluor argues that this offer was sufficiently
definite to form the basis of an enforceable agreement upon
acceptance by Fluor.

The Trust argues that there was no offer made by Orion and no agreement between the parties.  The Trust asserts that any statements made by Orion's representatives were conditional: that the Court had to approve the Critical Fire Vendor Motion, that Fluor had to be on the list in an agreed amount, and that the terms of the post-petition relationship had to be confirmed in a Trade Agreement.  The Trust contends that while the parties discussed these issues, no agreement was reached.  Where terms are left open or uncertain, there can be no agreement.  <u>See, e.g.</u>, <u>Villars v. Edwards</u>, 412 So. 2d 122, 124 (La. Ct. App. 1982) (finding no agreement where contractor claimed price quoted was a "ballpark" estimate).  The Trust especially notes that no written Trade Agreement was executed, as contemplated by the Critical Fire Vendor Order and as expected for such a large and complicated claim.

The Court disagrees.  Though Orion did state that the payment of Fluor's pre-petition claims was conditional, all the conditions were met.  The Court did approve the Critical Fire Vendor Motion, Fluor was included on the Critical Fire Vendor list, and Orion and Fluor did ultimately agree on the correct amount of Fluor's pre-petition claims.  (FOF 78-79, 85, 134)

The Court concludes further that there was no necessity for a written agreement.  The Critical Fire Vendor Motion and Order both expressly state that the execution of a Trade Agreement was

13

not a prerequisite to payment.  (FOF 74, 78-79, 150)  Through the MSA, the numerous work orders issued under the MSA, and an extensive course of dealing, all the material terms of the agreement between Orion and Fluor, including all terms necessary to calculate the amount owed for work done pre-petition, had been established and were in place as of the Petition Date.  (FOF 21)

The Trust argues nonetheless that the statements made by Bluth were not an offer or agreement to pay Fluor its pre-petition claims; instead, the Trust contends that Orion only stated that it "intended" to pay Fluor.

The Court concludes that this is a distinction without meaning.  Fluor clearly understood Bluth to be making an offer. Additionally, Orion acted as if it were an offer; Orion coupled its statements of its "intent" to pay the pre-petition claims with its request that Fluor continue the coker rebuild without interruption.  The Court concludes, therefore, that the statements made by the Orion representatives constituted an offer to Fluor: if Fluor completed the coker rebuild, its pre-petition claims would be paid in full.

The Court further finds that Fluor accepted the offer from Orion by making a conscious decision (at least by May 16, 2003) to take all steps necessary to complete the repairs.  Thus, the Court finds that Fluor accepted the offer by its actual performance in continuing and completing the coker rebuild.  La.

14

Civ. Code Ann. art. 1939 (1987) ("When an offeror invites an
offeree to accept by performance and, according to usage or the
nature or the terms of the contract, it is contemplated that the
performance will be completed if commenced, a contract is formed
when the offeree begins the requested performance."). See, e.g.,
Woods v. Morgan City Lions Club, 588 So. 2d 1196, 1200 (La. Ct.
App. 1991) (stating that "[o]nce an offer is made, consent to a
contract need not be expressed in words but may be implied by
actions of the parties"); Myers v. Myers, 532 So. 2d 490, 496
(La. Ct. App. 1988) (noting that "[c]onsent to an obligation can
be shown by performance and/or by silence"). See generally
Restatement (Second) of Contracts §62(1)-(2) (1981) ("Where an
offer invites an offeree to choose between acceptance by promise
and acceptance by performance, the tender or beginning of the
invited performance or a tender of a beginning of it is an
acceptance by performance."); 1-3 Arthur Linton Corbin, et. al.,
Corbin on Contracts § 3.8 at n. 18 (2006) ("If one offers a
promise to pay for specified construction or for service over a
period of time, the beginning of the work so that it is known by
the offeror may be a sufficient acceptance to bind both parties
by mutual promises.") (citing Fujimoto v. Rio Grande Pickle Co.,
414 F.2d 648 (5th Cir. 1969)).

The Trust argues that there is no evidence that Fluor
accepted any offer, because on June 6 Fluor was still considering

15

its other options.  (JTX 76)  Further, it contends that the fact
that Fluor and Orion continued to negotiate afterwards proves
that there was no agreement.

The Court disagrees.  In fact, the internal Fluor meeting on
June 6 was <u>after</u> the coker rebuild was complete and, therefore,
after Fluor had fully performed the post-petition agreement.[4]  By
that time, however, Orion had not performed any part of its
agreement; Fluor had received no payments for its pre-petition
claims.  Therefore, it is understandable that Fluor was
considering its options for how to get its pre-petition claims
paid.  The Court concludes that the June 6 presentation is
evidence that the parties were still trying to reconcile the
amount due, not that there was no agreement that the pre-petition
claims would be paid.

Thus, the Court concludes that Fluor has established that
there was a meeting of the minds to pay Fluor all of its
pre-petition claims under the Critical Fire Vendor Order if Fluor
continued to work and completed the coker rebuild.

3.  <u>Lawful Cause</u>

Another necessary element to a contract under Louisiana law
is "lawful cause."  La. Civ. Code Ann. art. 1966 (1987) ("An

---

[4]  It is important to remember that all the relevant events
occurred within a very short time frame.  The coker rebuild was
completed approximately three weeks after the bankruptcy case was
filed.

obligation cannot exist without a lawful cause.").  The

performance of, or promise to perform, an existing legal

obligation does not constitute lawful cause.  See, e.g., Arkansas

Louisiana Co. v. R.O. Roy & Co., 198 So. 768, 772 (La. 1940);

Castano v. Bellina, 503 So. 2d 195, 198 (La. Ct. App. 1987);

Standard Electric Construction Co. v. Frick Co., 134 So. 322,

322-23 (La. Ct. App. 1931).

    The Trust argues that there was no lawful cause for any

agreement made by it to pay Fluor, because Fluor's agreement to

complete the coker rebuild was merely a promise to perform a

legal obligation it already had.  The Trust asserts that the

February 4 Work Assignment (whereby Fluor became the general

contractor on the rebuild) was an executory contract, which Fluor

was obligated to perform.  After Orion commenced its chapter 11

proceeding, but before executory contracts were assumed or

rejected under section 365(a) of the Bankruptcy Code, the Trust

contends that the Fluor contract remained in existence and

enforceable by Orion, but not against it.  See, e.g., U.S. Postal

Service v. Dewey Freight Sys., Inc., 31 F.3d 620, 624 (8th Cir.

1994) (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 532

(1984)); In re University Medical Center, 973 F.2d 1065, 1075 (3d

Cir. 1992).

Fluor argues that the cases cited by the Trust do not stand for that proposition.[5]  The Court finds it unnecessary to decide this issue because it concludes that there was lawful cause for Orion's promise to pay Fluor's pre-petition claims.  Until the parties reached an agreement post-petition, Fluor was not legally obligated to complete the coker rebuild.  While there may have been Work Assignments still pending, the completion of the coker rebuild required numerous additional specific Work Assignments.  (FOF 28)  Fluor had the right under the MSA to refuse to accept any new Work Assignments.  (FOF 29)

Further, even if the contract to complete the coker rebuild was executory, Fluor could have filed a motion to compel Orion to assume or reject that contract.  If the contract was assumed, Orion would have been obligated to pay all pre-petition claims due to Fluor on that contract.  11 U.S.C. § 365(b)(1).  Further, although many of the Critical Fire Vendors had executory contracts which Orion felt it could enforce, Orion told the Court at the hearing on approval of the Critical Fire Vendor Motion

---

[5]  Fluor argues that the statement in <u>Dewey Freight</u> that executory contracts are "enforceable by the debtor" against the non-debtor was mere <u>dicta</u>.  31 F.3d at 624.  The Supreme Court in <u>Bildisco</u> held only that a non-debtor could not enforce an executory contract against a debtor.  465 U.S. at 532. Similarly, the Third Circuit in <u>University Medical Center</u> held that an executory contract may not be enforced against a debtor until it is assumed or rejected.  973 F.2d at 1075.  Therefore, Fluor asserts that there is no support for the Trust's contention that Fluor had to perform the February 4 Work Assignment.

18

that the possible disruption caused by seeking enforcement of those contracts could have detrimental effects on the estate by delaying the coker rebuild.  (FOF 75)  Accordingly, Orion obtained authority to pay up to $21.6 million in pre-petition debt owed to Critical Fire Vendors, whether they had an executory contract, executed a Trade Agreement, or had pre-petition debt unrelated to the coker rebuild.  (FOF 74-77)

Thus, the Court concludes that there was a lawful purpose for the agreement between Orion and Fluor that Orion would pay Fluor its pre-petition claims if Fluor finished the coker rebuild.

### 4.   Object

"Parties are free to contract for any object that is lawful, possible, and determined or determinable."  La. Civ. Code Ann. art. 1971 (1987).  There is no dispute that the object of the agreement in this case was the completion of the coker rebuild.

Consequently, the Court concludes that all elements necessary for the formation of a contract were established.  Orion agreed to pay Fluor its pre-petition claims in full if Fluor completed the coker rebuild.  Orion has breached that agreement.

### C.  Promissory Estoppel

Fluor also argues that the facts support its claim under a theory of promissory estoppel.  See generally Restatement

19

(Second) of Contracts § 90(1) (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.").  Fluor contends that in a commercial setting where damages are not speculative, "promissory estoppel is routinely used as a basis for awarding full expectation damages," particularly where the promisee has conferred a bargained-for benefit on the promisor, in order to avoid unjust enrichment.  See Mary A. Becker, Promissory Estoppel Damages, 16 Hofstra L. Rev. 131, 141 & 155 (1987) (expectation damages are appropriate where promissory estoppel is invoked in a case of lack of consideration or negligent or reckless misrepresentation).

The Trust argues that Louisiana law does not recognize a claim for promissory estoppel.  See, e.g., Morris v. Friedman, 663 So. 2d 19, 26 (La. 1995).  The Trust does acknowledge, however, that Louisiana has an analogous cause of action called detrimental reliance.  See La. Civ. Code Ann. art. 1967 (1987) ("A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.  Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the

20

promise.   Reliance on a gratuitous promise made without required

formalities is not reasonable.").   Nonetheless, the Trust

contends that detrimental reliance is a disfavored doctrine under

Louisiana law and should not be applied in this case.   See, e.g.,

Maddox v. Keen, 756 So. 2d 1279, 1283 (La. Ct. App. 2000)

(detrimental reliance is "sparingly applied as it bars the normal

assertion of rights otherwise present.").

In order to prove a claim for detrimental reliance under

Louisiana law, Fluor must establish by a preponderance of the

evidence that: (1) a representation was made, (2) Fluor

reasonably and justifiably relied on that representation, and (3)

Fluor changed its position to its detriment as a result of that

reliance.   See, e.g., Water Craft Management L.L.C. v. Mercury

Marine, 361 F.Supp. 2d 518, 556 (M.D. La. 2004); Carter v. Huber

& Heard, Inc., 657 So. 2d 409, 411 (La. Ct. App. 1995); Daigle

Brothers Sand & Dirt, Inc. v. Sec'y of the Dept. of Revenue &

Taxation, 594 So. 2d 935, 937 (La. Ct. App. 1992).

The Court concludes that Fluor has established a case for

detrimental reliance.   As found above, Orion did make a promise

to Fluor which it reiterated several times: if Fluor completed

the coker rebuild, Orion would pay Fluor's pre-petition claims in

full.   (FOF 53-54, 63-64, 93, 95, 97-98, 103-07, 111)   Fluor

relied on that promise by completing the coker rebuild ahead of

schedule in a workman-like manner.   (FOF 112-13)   Fluor's

21

reliance was justified given the fact that Orion had filed a Critical Fire Vendor Motion which was approved by the Court with a sufficient cap to cover Fluor's pre-petition claims and Orion had acknowledged that Fluor was a Critical Fire Vendor.  (FOF 53-54, 63-64, 78-79, 93, 95, 97-98, 103-07, 111)  Finally, Fluor changed its position by completing the coker rebuild rather than exercising its other options such as walking off the job or filing a motion to compel Orion to assume or reject the MSA. (FOF 88-89, 112-13)

Therefore, the Court concludes that even in the absence of an agreement, there is ample evidence in the record to apply the doctrine of detrimental reliance under Louisiana law to grant damages suffered by Fluor as a result of its reliance on Orion's commitments.

D.    <u>Misrepresentations by Orion</u>

Fluor argues alternatively that, even if there was no agreement, Orion misrepresented its intentions to Fluor, who relied on them to its detriment resulting in recoverable damages. Fluor contends that, if Orion was not making an offer by its statements, then its representations were misleading.  It notes that Victor himself admitted that Bluth's statements that Orion intended to pay Fluor's pre-petition claims in full "could be misleading."  (FOF 149)

22

The elements of fraudulent misrepresentation under Louisiana law are: (1) the intent to defraud or gain an unfair advantage, (2) reliance by the other party, and (3) resulting damage.  La. Civ. Code Ann. art. 1953 (1987) ("Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction.").  See, e.g., Hall v. Arkansas-Louisiana Gas Co., 368 So. 2d 984 (La. 1979); Dutton & Vaughan, Inc. v. Spurney, 600 So. 2d 693, 698 (La. Ct. App. 1992); Home Indem. Co., Inc. v. Boe, 499 So. 2d 1301 (La. Ct. App. 1986); Automatic Coin Enterprises, Inc. v. Vend-Tronics, Inc., 433 So. 2d 766 (La. Ct. App. 1983).  As the plaintiff, Fluor bears the burden of proving each element of its claim.  See, e.g., Chiarella v. Sprint Spectrum LP, 921 So. 2d 106, 123 (La. Ct. App. 2005).

    1.   Intent to Defraud

The Trust argues that the statements on which Fluor relies were merely statements of intent concerning future events.  As such, it contends that they cannot form the basis of a misrepresentation claim, because under Louisiana law statements of intention or promises to perform an act in the future cannot support a claim for fraud unless the party making the statement actually did not intend to complete the act at the time the statement was made.  See, e.g., America's Favorite Chicken Co. v.

23

<u>Cajun Enterprises, Inc.</u>, 130 F.3d 180, 186 (5th Cir. 1997) ("Under Louisiana law, a cause of action exists for fraudulent misrepresentation of <u>past</u> or <u>present</u> facts; 'unfulfilled promises or statements as to future events,' however, cannot be the basis for a fraud action.") (emphasis in original) (internal citations omitted); <u>Sun Drilling Products Corp. v. Rayburn</u>, 798 So. 2d 1141, 1152 (La. Ct. App. 2001) ("Fraud, however, cannot be predicated on unfulfilled promises or statements as to future events."); <u>Bass v. Coupel</u>, 671 So. 2d 344, 351 (La. Ct. App. 1996) ("Statements promissory in their nature and relating to future actions do not constitute actionable fraud."); <u>Dutton v. Vaughan, Inc.</u>, 600 So. 2d 693, 698 (La. Ct. App. 1992) ("Fraud . . . cannot be predicated on unfulfilled promises or statements as to future events."); <u>Chrysler Credit Corp. v. Seemann</u>, 470 So. 2d 329, 331 (La. Ct. App. 1985) (failure to perform future act does not support claim for fraud).

The Trust contends that there is no evidence that Bluth and the other Orion representatives lacked the intent to pay Fluor at the time they informed Fluor that Orion intended to name it a Critical Fire Vendor. Accordingly, it argues that Fluor has not established a necessary element to support its claim of misrepresentation.

The Court disagrees. If the statements made by Orion's representatives were not an offer to pay Fluor if it completed

24

the coker rebuild, then the Court concludes that they were misrepresentations. While the Court does not believe that Bluth intended to defraud Fluor, the Court believes that Victor did. Victor testified that representations by Orion that it would pay Fluor's pre-petition claims in full could be misleading because of the fact that Fluor was listed on the internal Critical Fire Vendor list at a fraction of its pre-petition claims. (FOF 34) Victor himself was present when some of these representations were made to Fluor, on May 16 and 20, 2003. (FOF 97-99, 102-10) In neither instance did Victor correct the misleading statements. (FOF 109, 148) Although Victor told Fluor that the amount of its pre-petition claims was different from what Orion had listed, he urged Fluor to submit invoices for the pre-petition work. (FOF 105-07) Victor never told Fluor that once those invoices were submitted they would <u>not</u> be paid. (FOF 109) In fact, the implication was that they <u>would</u> be paid.

The Court concludes that Victor (and, therefore, Orion) had the intent to defraud Fluor by leading it to believe that it would be paid in full if it completed the coker rebuild, even though Victor knew that Fluor would not be paid.

        2.   <u>Justifiable Reliance</u>

The Trust also contends that Fluor cannot show that it justifiably relied upon any representations by Orion. The Trust asserts that, at all times, Orion emphasized to Fluor that

payment was conditioned on numerous factors, which were beyond
its control, namely, Court approval, availability of funds, and
reconciliation.  According to the Trust, any reliance by Fluor on
statements that Orion intended to pay it were not justified
because the satisfaction of these events was uncertain.

The Court disagrees.  While the statements by Orion were
conditional, all the conditions were met: the Court did approve
the Critical Fire Vendor Motion, Fluor was identified as a
Critical Fire Vendor (in fact, the Critical Fire Vendor), and the
parties did agree on the terms of their post-petition
relationship.  (FOF 21, 78-79, 85)  Although that relationship
was not reduced to a written Trade Agreement, the Critical Fire
Vendor Order specifically provided that such an agreement was not
necessary.  (FOF 74)  Finally, the amount due to Fluor was
ultimately reconciled by the parties.  (FOF 134)

The Court finds that the delay in reconciliation was largely
Orion's fault, either from a purposeful effort to avoid paying
Fluor until after the coker rebuild was completed (at which time
it would refuse to pay) or simply because Orion had other
pressing matters.  In either event, because Orion said it would
pay Fluor's pre-petition claims in full, it was not necessary
that the amount be reconciled for Fluor to justifiably rely on
that representation.

26

3.    <u>Damages</u>

The Trust finally argues that Fluor has not established that it was injured (acted to its detriment) as a result of its purported reliance.  The Trust asserts that Fluor suffered no harm from its completion of the project in reliance on Orion's promises to pay for the pre-petition claims because Fluor was paid in full for its post-petition work and, therefore, has been fully compensated for any post-petition benefit it conferred on the estate.  <u>See, e.g.</u>, <u>In re Patch Graphics</u>, 58 B.R. 743, 745 (Bankr. W.D. Wis. 1986) (administrative claim allowed only to extent that benefit was conferred on the estate).  <u>See also</u> <u>In re Nat'l Steel Corp.</u>, 316 B.R. 287, 300 (Bankr. N.D. Ill. 2004); <u>In re Bridgeport Plumbing Prods., Inc.</u>, 178 B.R. 563, 567-68 (Bankr. M.D. Ga. 1994); <u>In re Express One Int'l, Inc.</u>, 217 B.R. 207, 211 (Bankr. E.D. Tex. 1998).

The Court disagrees with the Trust.  Orion's representations did cause Fluor to act to its detriment: it finished the coker rebuild ahead of schedule without first acting to protect its pre-petition claims.  (FOF 112-13)  If Fluor had not relied on Orion's promises to pay for the pre-petition claims, Fluor would have had several options, including filing a motion to force Orion to assume its executory contract.  If that had been filed, and Orion had assumed the contract, then Orion would have had to pay Fluor's pre-petition claims in full.  11. U.S.C. § 365(b)(1).

27

It is likely that Orion would have assumed the contract given Fluor's important role in the coker rebuild.  Orion stated at the hearing on the Critical Fire Vendor Motion that it wanted authority to pay Critical Fire Vendors even if Orion could enforce an executory contract against them, because of the harm the estate would suffer if the coker rebuild were delayed by litigation over enforceability of such contracts.  (FOF 72-77)

Consequently, the Court concludes: (1) if there was no agreement between the parties for the payment of Fluor's pre-petition claims, then Orion mislead Fluor into believing that it would pay those claims; (2) Fluor reasonably relied on Orion's misrepresentations and Fluor acted to its detriment by completing the coker rebuild; and (3) Fluor has established it is entitled to damages for the harm caused by its reliance on those misrepresentations.

E.    Amount of Damages

1.    Compensatory Damages

Because Fluor fully performed all its obligations under the post-petition agreement with Orion, Fluor is entitled to recover its "expectancy" as the measure of damages for Orion's failure to pay.  La. Civ. Code Ann. art. 1995 (1987) ("Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived."). See generally Restatement (Second) of Contracts § 347 (1981) ("[T]he injured party has a right to

28

damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform."); 11-55 Arthur Linton Corbin et al., Corbin on Contracts §55.3 (2006) ("In determining the amount of compensation as the 'damages' to be awarded [for a breach of contract], the aim in view is to put the injured party in as good a position as that party would have been if performance had been rendered as promised.").

The Trust asserts, however, that the Critical Fire Vendor Motion only sought $21.6 million for payment of Critical Fire Vendors and that Fluor was only listed for $3.7 million (the amount of invoices that Fluor had sent to Orion as of the time the Motion was prepared).  (FOF 73, 80, 85)  Approximately $9.9 million has already been paid to other Critical Fire Vendors. (FOF 137)  Therefore, the Trust argues that the most Fluor can be awarded is approximately $11.7 million.

Flour argues that the Trust failed to establish that the payments made by Orion to the other vendors were authorized by the Critical Fire Vendor Order.  Specifically, Fluor argues that there is no evidence that they were, in fact, Critical Fire Vendors.

The Court disagrees with Fluor on this factual point. Victor testified that the vendors Orion paid were Critical Fire Vendors and that he had negotiated Trade Agreements with them. (FOF 137)  Fluor presented no evidence to the contrary.  The Court accepts that testimony as evidence that the payments were appropriate and were authorized under the Critical Fire Vendor Order.

The Court disagrees, however, with the Trust's assertion that Fluor cannot receive the full amount of its damages because of the cap in the Critical Fire Vendor Order.  The Court has the power to modify the Critical Fire Vendor Order as necessary to achieve its goals.  See, e.g., In re Fonner, 262 B.R. 350, 356 (Bankr. W.D. Pa. 2001) (concluding that bankruptcy court has authority under Fed. R. Civ. P. 60(b) to modify prior order it entered where appropriate to accomplish justice).  The Critical Fire Vendor Motion sought authority to pay the Critical Fire Vendors their pre-petition claims in full in order to get the coker rebuild completed to facilitate the sale to Valero.  The Trust does not dispute that Fluor was a Critical Fire Vendor and, in fact, the largest and most important of those vendors.  (FOF 85, 145)  The Trust also does not now dispute the amount of Fluor's pre-petition claims.  (FOF 134)  The Court, therefore, finds sufficient cause to modify the Critical Fire Vendor Order to permit payment in full of Fluor's pre-petition claims.

30

The Trust argues further, however, that only the fire-related portion of Fluor's pre-petition claims should be paid under the Critical Fire Vendor Order.  This is contradicted, however, by the Critical Fire Vendor Motion itself and by the assertions made by Orion's counsel at the hearing on approval of that Motion.  (FOF 70, 77)  Orion requested, and the Court authorized, the payment of all pre-petition claims of Critical Fire Vendors (even those unrelated to the coker rebuild) in order to avoid any interruption in the completion of the coker rebuild. (FOF 78-79)  Therefore, the Court concludes that Fluor is entitled to payment of all of its pre-petition claims.

     2.   <u>Interest</u>

"When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500.  The obligee may recover these damages without having to prove any loss, and whatever loss he may have suffered he can recover no more."  La. Civ. Code Ann. art. 2000 (1987). <u>See, e.g.</u>, <u>A.P.S., Inc. v. Standard Motor Products, Inc.</u>, 295 B.R. 442 (D. Del. 2003) (awarding pre-judgment interest for breach of post-petition contract); <u>Newman Marchive P'ship v. City of Shreveport</u>, 923 So. 2d 852, 861 (La. Ct. App. 2006) (awarding interest and citing La. Civ. Code Ann.

art. 2000 (1987)). <u>See generally</u> Restatement (Second) of
Contracts § 354(1) (1981) ("If the breach consists of a failure
to pay a definite sum in money or to render performance with
fixed or ascertainable monetary value, interest is recoverable
from the time for performance on the amount due less all
deductions to which the party in breach is entitled."); 11-57
Arthur Linton Corbin et al., Corbin on Contracts §57.18 (2006)
("In all jurisdictions simple interest at the statutory legal
rate is recoverable as damages for non-payment of a liquidated
debt from the date of breach if the parties involved have not
themselves provided otherwise by contract.").

As noted above, the Court finds that Orion's refusal to pay
Fluor's pre-petition claims, as it promised, constitutes a breach
of a post-petition agreement to pay a definite sum of money
(namely, the amount of Fluor's pre-petition claims). As a
result, the Court concludes that Fluor is entitled to recover
from the Trust the principal sum of $20,657,860.58 together with
pre-judgment interest, calculated from the date of reconciliation
of the sum due through the date of entry of the judgment.

The MSA did not provide for interest on unpaid invoices.
(JTX 83) Therefore, pre-judgment interest on Fluor's pre-
petition claims shall be calculated at the legal rate set forth
in the Louisiana statute. The Trust notes, however, that this
calculation is complicated by the fact that the Louisiana legal

32

rate is adjusted periodically.  Therefore, the Court will direct that Fluor calculate the sum due and allow the Trust to comment on the accuracy of that calculation.

       3.   Attorneys' Fees

Fluor argues that it is well established that "the federal exception" to the "American Rule" allows a court, in the exercise of its equity powers, to award attorneys' fees to a party where the opponent has acted in bad faith.  See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975); In re Fox, 725 F.2d 661 (11th Cir. 1984); In re Nangle, 281 B.R. 654 (B.A.P. 8th Cir. 2002); In re Neal, No. 05-01676, 2006 Bankr. LEXIS 736, at *1 (Bankr. D.D.C. Feb. 24, 2006); In re Reilly, 244 B.R. 46 (Bankr. D. Conn. 2000).  A court is justified in awarding attorneys' fees for bad faith where recalcitrance forces a claimant to hire a lawyer and go to court to get what is plainly owed.  See, e.g., Vaughn v. Atkinson, 369 U.S. 527 (1962); Lewis v. Texaco, 527 F.2d 921 (2d Cir. 1975); Lewis v. Texaco, 418 F.Supp. 27 (S.D.N.Y. 1976) (on remand).  See generally "Attorney's Fees and the Federal Bad Faith Exception," 29 Hastings L. J. 319, 323-326 (1978).

In this case, the Court concludes that an award of attorneys' fees is warranted because of Orion's refusal to pay Fluor any amount of its pre-petition claims even though Fluor fully completed the coker rebuild and even though Orion admits it

had authority under the Critical Fire Vendor Order to pay at
least $11.7 million of those claims.  Orion's actions evidence
its bad faith: requiring Fluor to submit and reconcile all its
invoices before any payment would be made, dragging out the
reconciliation process, ultimately refusing to pay any of Fluor's
pre-petition claims, and opposing Fluor's Complaint and Motion
for Relief.

The Court suspects that one reason Orion and the Trust
refused to pay Fluor was because they contend that Fluor was
responsible for the fire.  Until Orion is successful in its
action against Fluor on that claim, however, it has no defense to
payment of Fluor's claims as promised.  (FOF 127)  See, e.g., In
re Worldwide Direct, Inc., No. 99-108, 2000 WL 33712474 (Bankr.
D. Del. Nov. 22, 2000) (overruling objection to claim based on
debtor's alleged preference action against creditor because
preference had not been adjudicated) (citing Woolley's Parkway
Ctr., Inc., 147 B.R. 996 (Bankr. M.D. Fla. 1992)).

The sheer recalcitrance that characterizes Orion's refusal
to pay amounts plainly owed constitutes bad faith justifying the
exercise of this Court's equitable powers to award attorneys'
fees.  The Court will, therefore, consider an award of attorneys'
fees in favor of Fluor.  The Court will direct Fluor to submit
its fee request and permit the Trust to object to any fees
requested.

34

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant the relief requested by Fluor and direct the payment of its pre-petition claims in full, together with interest and attorneys' fees as may be awarded by the Court.

An appropriate Order is attached.


Dated: July 20, 2007                    BY THE COURT:

                                        Mary F. Walrath
                                        United States Bankruptcy Judge

**EXHIBIT D**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ORION REFINING CORPORATION, | ) Case No. 03-11483(MFW) |
| | ) |
| Debtor. | ) Related Documents: 1283 and |
| | ) 1788 |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary No. 04-52447(MFW) |
| | ) |
| ORION REFINING CORPORATION, | ) |
| CYPRESS ASSOCIATES, LLC as | ) |
| ORC DISTRIBUTION TRUST | ) |
| REPRESENTATIVE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| ORION REFINING CORPORATION, | ) |
| | ) |
| Counter-Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
| Counter-Defendant. | ) |

### ORDER

**AND NOW** this **20th** day of **JULY, 2007**, upon consideration of the arguments and briefs of the parties and the evidence presented at trial and on the basis of the accompanying Opinion and Findings of Fact, it is hereby

**ORDERED** that judgment is entered in favor of Fluor Enterprises, Inc., and against the ORC Distribution Trust in the principal amount of $20,657,860.58; and it is further

**ORDERED** that Fluor Enterprises, Inc., shall be entitled to pre-judgment interest and attorneys' fees as may be entered by the Court after consideration of the further submissions of the parties; and it is further

**ORDERED** that Fluor Enterprises, Inc., shall submit its request for award of pre-judgment interest and attorneys' fees within 60 days of the entry of this Order; and it is further

**ORDERED** that the ORC Distribution Trust shall file any objection or response to the request of Fluor Enterprises, Inc., within 30 days thereafter.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Francis A. Monaco, Esquire[1]

---

1  Counsel is to serve a copy of this Order and accompanying Opinion and Findings of Fact on all interested parties and file a Certificate of Service with the Court.

SERVICE LIST

William H. Sudell, Esquire
Donna L. Culver, Esquire
Thomas W. Briggs, Jr., Esquire
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Counsel for the ORC Distribution Trust

Francis A. Monaco, Esquire
Kevin J. Mangan, Esquire
Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Counsel for Fluor Enterprises, Inc.

Joseph B.C. Kluttz, Esquire
Kennedy Covington, Esquire
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202
Counsel for Fluor Enterprises, Inc.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ORION REFINING CORPORATION, | ) Case No. 03-11483(MFW) |
| | ) |
|        Debtor. | ) Related Documents: 1283 and |
|                          | )                   1788 |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
|    v. | ) Adversary No. 04-52447(MFW) |
| | ) |
| ORION REFINING CORPORATION, | ) |
| CYPRESS ASSOCIATES, LLC as | ) |
| ORC DISTRIBUTION TRUST | ) |
| REPRESENTATIVE, | ) |
| | ) |
|        Defendant. | ) |
| | ) |
| ORION REFINING CORPORATION, | ) |
| | ) |
|        Counter-Claimant, | ) |
| | ) |
|    v. | ) |
| | ) |
| FLUOR ENTERPRISES, INC., | ) |
| | ) |
|        Counter-Defendant. | ) |

<u>**ORDER**</u>

**AND NOW** this **20th** day of **JULY, 2007,** upon consideration of the arguments and briefs of the parties and the evidence presented at trial and on the basis of the accompanying Opinion and Findings of Fact, it is hereby

**ORDERED** that judgment is entered in favor of Fluor Enterprises, Inc., and against the ORC Distribution Trust in the principal amount of $20,657,860.58; and it is further

**ORDERED** that Fluor Enterprises, Inc., shall be entitled to pre-judgment interest and attorneys' fees as may be entered by the Court after consideration of the further submissions of the parties; and it is further

**ORDERED** that Fluor Enterprises, Inc., shall submit its request for award of pre-judgment interest and attorneys' fees within 60 days of the entry of this Order; and it is further

**ORDERED** that the ORC Distribution Trust shall file any objection or response to the request of Fluor Enterprises, Inc., within 30 days thereafter.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Francis A. Monaco, Esquire[1]

---

1  Counsel is to serve a copy of this Order and accompanying Opinion and Findings of Fact on all interested parties and file a Certificate of Service with the Court.

SERVICE LIST

William H. Sudell, Esquire
Donna L. Culver, Esquire
Thomas W. Briggs, Jr., Esquire
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Counsel for the ORC Distribution Trust

Francis A. Monaco, Esquire
Kevin J. Mangan, Esquire
Monzack and Monaco, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801
Counsel for Fluor Enterprises, Inc.

Joseph B.C. Kluttz, Esquire
Kennedy Covington, Esquire
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202
Counsel for Fluor Enterprises, Inc.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number: _____  ○ BK   ○ AP

   If AP, related BK Case Number: _____

Title of Order Appealed:

_____
      Docket Number: _____     Date Entered: _____

Item Transmitted:  ○ Notice of Appeal     ○ Motion for Leave to Appeal
                ○ Amended Notice of Appeal   ○ Cross Appeal
               Docket Number: _____   Date Filed: _____

*Appellant/Cross Appellant:           *Appellee/Cross Appellee
_____      _____
Counsel for Appellant:              Counsel for Appellee:

_____      _____
_____      _____
_____      _____
_____      _____
_____      _____

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?  ○ Yes  ○ No

IFP Motion Filed by Appellant?  ○ Yes  ○ No

Have Additional Appeals to the Same Order been Filed? ○ Yes  ○ No
   If so, has District Court assigned a Civil Action Number?  ○ Yes ○ No  Civil Action # _____

Additional Notes:

_____

_____   By: _____
Date                            Deputy Clerk

                                        FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: _____
7/6/06